THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CARMELO QUINTANA *et al.*, Defendants-Appellants.

First District (3rd Division)    Nos. 1—00—3319, 1—00—3450 cons.

Opinion filed June 19, 2002.—Rehearing denied August 5, 2002.

Sarah Curry, of State Appellate Defender's Office, of Chicago, for appellants.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Margaret J. Campos, and Paula Borg, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SOUTH delivered the opinion of the court:
On February 19, 1999, defendants Carmelo Quintana and Jorge

Navarrete were charged with five counts of aggravated criminal sexual assault, four counts of aggravated kidnaping, one count of criminal sexual assault, and two counts of kidnaping. In a bench trial, defendants were simultaneously but separately tried and found guilty of aggravated criminal sexual assault and aggravated kidnaping. Quintana was sentenced to 15 years' imprisonment on the aggravated criminal sexual assault charge and 6 years for aggravated kidnaping. Navarrete received a 20-year sentence for the aggravated criminal sexual assault conviction and 6 years for aggravated kidnaping. Both of defendants' sentences run consecutively.

The evidence adduced at trial was as follows: the victim, L.D., testified that on January 21, 1999, at approximately 9 p.m., she was walking home from her mother's house on 51st Street a block past Western Avenue toward California Avenue in Chicago, Illinois. She walked in the street because the sidewalks were covered with snow and ice. As she was walking, a gold Ford Aerostar van drove alongside her, and someone pulled her inside the vehicle. Dagoberto Alvorado was driving the van, defendant Navarrete sat in the middle seat behind the driver and passenger seats, and defendant Quintana sat in the third rear seat behind the middle seat. L.D. was pulled into the middle seat with Navarrete. Quintana held her from behind while Navarrete struck her with a beer bottle and told her what he wanted to do to her. She began to take off her pants in order to avoid being struck again, and Navarrete pulled them off the rest of the way and lowered his own pants. He then laid on top of her and attempted to have intercourse with her. He rubbed his penis against her vagina, but there was no penetration. Quintana slapped her legs and buttocks and laughed. Navarrete got off of her, at which time she tried to escape through the side door but was pulled back into the van. Navarrete told Quintana to watch L.D. and make sure that she did not escape. L.D. asked defendants to release her, but they refused. In order to have a better chance of escaping, she suggested to defendants that she get on top of Navarrete. At that time, Navarrete's penis made contact with her vagina. She then struck Navarrete and jumped between the driver and passenger front seats and out of the front passenger door. Defendants pushed her out as she was escaping the moving van. L.D. sprained her ankle and bruised her knees and ankles as a result of jumping from the moving van. She also sustained bruises and lacerations to her throat, face and jaw. When she jumped out of the van she was wearing only a blouse and a sock because her jeans, coat, scarf, sock and boots were still in the van. L.D. was taken to Holy Cross Hospital, where she was treated and released.

On January 22, 1999, the police brought L.D. to a van which she

identified as the vehicle in which she was assaulted. She also identified some of her clothing, which was found inside the van. Later she viewed a lineup and identified defendants as the men who sexually assaulted her.

L.D. testified that she had two convictions for possession of a controlled substance and admitted to using her sister's name at the time of the arrests. She denied being arrested for prostitution and denied agreeing to have sex with defendants, although she did admit to drinking with her family on the day of the attack.

Clarisa Figuero testified on behalf of the State that at approximately 9 p.m. on January 21, 1999, she was walking down the street when she observed the driver's side of a gold Ford Aerostar van which was speeding through an alley. She could only see shadows but not the people inside. The van momentarily slowed down, and immediately thereafter she saw L.D. standing in the alley wearing only a shirt. Figuero approached L.D., who was screaming that she had been raped. L.D. was bleeding from her mouth and had cuts on her face and neck. Figuero gave her her coat and walked with her to a neighbor's house where they called the police.

Figuero further testified that on January 22, 1999, the police came to her home and asked her to identify the vehicle she saw driving through the alley. Figuero had seen the van in the neighborhood and knew the owner. She identified the van by its color and the objects that were hanging from the rearview mirror.

Chicago police officer Stephanie Quinn testified that on January 22, 1999, she and her partner, Officer Kenny Cap, picked up L.D. from her home and drove her to a van on 44th Street and Francisco Avenue in Chicago, Illinois. L.D. identified the van as the one in which she had been assaulted on the prior evening. On January 22, 1999, Officers Williams and Fleming were conducting surveillance on Navarrete's van and home. When he came out of the house, they asked him for identification, which he said was inside the house. They followed him into the house, found Quintana in the kitchen and placed both men under arrest.

Chicago police detective Sarro Komorowski testified that he interviewed L.D. on February 26, 1999. He observed lacerations and bruises on her. In describing the attack, L.D. told him that she pulled down her pants at the time of the attack because she was frightened and wanted to avoid being struck again. She also told him that Navarrete finished pulling off her pants because she was taking too long. She told Komorowski that Navarrete had sex with her and that she got on top of Navarrete in order to escape, but she was afraid of being under him. She also told Komorowski that Navarrete inserted his

penis inside her more than once. Komorowski's report reflected that L.D. told him that Navarrete's penis was inside her, but he could not remember if L.D. had told him that. L.D. told Komorowski that Navarrete's penis was between her legs and against her vagina, partially between her labia and partially inside her vagina, and that the position of Navarrete's penis varied according to L.D.'s position with respect to Navarrete and whether or not they were struggling.

Chicago police officer Eduardo Casas testified that on January 22, 1999, he was a certified Spanish language specialist for the police department and assisted in the investigation of L.D.'s case by translating the conversations between Chicago police detectives Komorowski and Adams and defendants. Casas advised Quintana of his *Miranda* rights in Spanish, and he also advised Navarrete of his *Miranda* rights in Spanish. Casas assisted Assistant State's Attorney Clarissa Palermo in Navarrete's interview, and Navarrete agreed to reduce his statement to writing. Palermo and Casas spoke with Quintana, and he agreed to put his statement in writing. Casas advised defendants of their *Miranda* rights in Spanish prior to their interview with Palermo.

Quintana's statement read that on January 21, 1999, around 8 p.m., Alvarado was driving Navarrete's van with Quintana and Navarrete in the passenger seats. They picked up L.D. around 51st Street and Damen Avenue because she had asked for a ride while walking in the street. L.D. sat next to Alvarado in the front passenger seat. As Alvarado drove near an alley at 46th Street and Rockwell Street, he stopped the van, and Navarrete pulled the victim into the backseat and attempted to pull off her pants. She struggled against him, and he slapped her face. Navarrete attempted to have sex with the victim, who said "no" while he tried to pull down her pants. Navarrete stopped having sex with L.D. for two minutes then grabbed her again. Quintana covered the victim's mouth when she screamed. Quintana watched Navarrete have sex with her and grabbed her when she tried to escape. L.D. repositioned herself on top of Navarrete and had sex with him. Quintana slapped L.D. on the buttocks while she was on top of Navarrete. Five minutes later, L.D. jumped off Navarrete and out the front passenger door wearing only a T-shirt. Later Navarrete put L.D.'s clothes in a plastic bag and gave it to Quintana, who placed it in a garbage can in an alley.

Navarrete's statement read that on January 21, 1999, around 7:30 or 8 p.m., he was in his van with Quintana and Alvarado around 51st Street and Damen Avenue. Navarrete saw L.D. walking down the street and agreed to give her a ride. Navarrete drove the van into an alley near 45th and Rockwell Street, stopped the van, and pushed L.D. into the backseat. Navarrete climbed into the backseat and tried to

remove L.D.'s pants, at which time she began screaming. Quintana covered her mouth and restrained her. L.D. asked defendants not to hurt her and began removing her pants. She said "no" three times. Navarrete finished pulling off her pants, pulled down his pants, got on top of the victim and began rubbing his penis against her. Navarrete told Quintana to watch the door in case she tried to escape. Navarrete laid down and L.D. got on top of him. He held her under the arms while she was on top. His penis was partially inside her vagina for 10 minutes. As the van approached 44th Street and Washtenaw Avenue, the victim got off Navarrete and jumped out of the front passenger door wearing only a T-shirt. Defendants drove away. Navarrete found L.D.'s clothes, and Quintana threw them into a garbage can.

At trial, Quintana testified that on January 21, 1999, around 7 p.m., he was in Navarrete's van with Alvarado and Navarrete, who was driving. Alvarado sat in the middle seat, and Quintana sat in the far rear seat. They drove to a liquor store near 51st Street and Damen Avenue where Navarrete exited the van and vomited. L.D. approached Navarrete, asked him for a ride home, and got into the van. Navarrete sat in the driver's seat, and L.D. sat in the front passenger's seat. They drove toward 45th Street and Western Avenue to a friend's home. Alvarado asked L.D. if she wanted a beer, and she said yes. Everyone drank beer, including L.D. Quintana testified that Alvarado spoke English to the woman, but he could not understand what they were saying. Alvarado asked L.D. in English if she wanted to have sex, and she said "no." She drank another beer, and Alvarado asked her again if she wanted to have sex with him. At this time, she said that she would have sex if he paid her. Quintana testified that Alvarado asked Navarrete to drive to an alley. The van stopped, and Alvarado went to the front passenger door and opened it. L.D. told Alvarado to get in the backseat. Alvarado and L.D. had sex in the middle seat with Alvarado on top. They changed positions, and L.D. got on top of Alvarado. Navarrete began driving, and when they reached 43rd Street and Washtenaw Avenue, Alvarado and L.D. began arguing in English. At that time, she jumped out the front passenger side door. Quintana also testified that he did not have sex with L.D. nor did he hit, restrain or laugh at her. Navarrete stopped the van and asked why she had left. Alvarado told him that she had wanted more money, but he had refused. Quintana did not know what happened to the clothes that L.D. had left in the van. They then drove to Ford City to pick up Navarrete's wife. After picking up Navarrete's wife, they dropped off Alvarado at 43rd Street and Maplewood Avenue, and then Navarrete, his wife and Quintana went to Navarrete's home. Quintana does not know of Alvarado's whereabouts.

Quintana testified further that on January 22, 1999, at 10 a.m., he was arrested and taken to the police station. The police asked him several times to give a statement and stated that, if he signed some papers, he could go home. The police told him that Navarrete had already signed the papers. Quintana testified that the papers were not translated for him into Spanish. Casas spoke to him in Spanish but never translated the papers. Casas told him to sign each page. Quintana had known Navarrete for 20 years and was living with him at the time of his arrest. Quintana also testified that L.D. removed her own clothes and that he told the police that Alvarado had sex with L.D. for $20. He did not know what happened to L.D.'s clothes, but they were not in the van when they picked up Navarrete's wife. Quintana never told Casas that Navarrete tried to remove the victim's pants and have sex with her or that he, Quintana, covered the victim's mouth when she screamed.

Navarrete testified that on January 21, 1999, around 8 p.m., he was driving Quintana and Alvarado to a liquor store. Quintana was sitting in the farthest rear seat, and Alvarado was sitting in the middle seat behind Navarrete. He pulled the van over because he had to vomit. L.D. approached Navarrete, asked him in Spanish for a ride to 44th Street and Kedzie Avenue and sat in the front seat on the passenger's side. As they approached 45th Street and Western Avenue, Alvarado asked L.D. in Spanish if she wanted to have sex, and she said "no." Alvarado gave her a beer and asked her again, and this time she agreed to have sex if Alvarado paid her $20. Alvarado told Navarrete to drive to the alley between 44th and 45th Streets because he was going to have sex with L.D. They parked the van in an alley near a friend's garage, and Alvarado got out of the vehicle and went to the front passenger door and removed L.D.'s boots and pants. L.D. and Alvarado moved to the middle seat and began having sex with Alvarado positioned on top. Quintana told Navarrete to drive. L.D. then got on top of Alvarado near 44th Street and Maple Street. L.D. never told Alvarado to stop, and he did not see Alvarado give L.D. money. As they approached Rockwell Street, L.D. and Alvarado began arguing. Navarrete did not understand what they were saying because they were speaking English. Navarrete turned onto 43rd Street and Washtenaw Avenue, and at that time L.D. jumped out of the moving van. Alvarado said that L.D. had left because he had refused to give her more money. Navarrete did not know what happened to L.D.'s clothes, and he never had sex with her or struck her.

Navarette further testified that L.D. never mentioned sex for money before he agreed to give her a ride. He testified that L.D. was a "lady of the streets" and that she and Alvarado agreed in Spanish

that she would have sex with him for $20. Alvarado told him to drive to the alley because L.D. requested in English that they drive down the alley. He did not know what happened to the victim's clothes, but they were not inside the van. While he had known Alvarado for 12 years, he did not know his current whereabouts.

Navarrete further testified that when the police first interviewed him, he refused to talk to them but spoke to them the second time they approached him. An assistant State's Attorney took notes in another interview. Casas showed Navarrete the notes, but he did not understand them. He never told Casas that he pushed L.D. into the backseat, or that he tried to take off her pants or that L.D. screamed. He did not tell Casas that Quintana covered L.D.'s mouth, nor did he tell Casas that he found L.D.'s clothes and that Quintana threw them into a garbage can. He did tell Casas that he drove the van and asked Alvarado what had happened after L.D. left.

Defendants have raised four issues for our review: (1) whether their convictions for aggravated kidnaping should be vacated because the asportation and detention of the victim were incidental to the offense of aggravated criminal sexual assault; (2) whether the trial court abused its discretion in sentencing Navarrete to a 26-year consecutive sentence and Quintana to a 21-year consecutive sentence; (3) whether Navarrete's judgment order should be amended to reflect that he served a total of 609 days where he remained in custody from the time of his arrest on January 22, 1999, to the date of his sentencing hearing on September 22, 2000; (4) whether defendants' mittimus orders should be corrected to reflect a different entry of judgment for the aggravated kidnaping count where the mittimus orders show that defendants were convicted of aggravated criminal sexual assault and aggravated kidnaping based on aggravated criminal sexual assault.

■ The appropriate standard of review in sex offense cases is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Riley*, 219 Ill. App. 3d 482, 490, 579 N.E.2d 1008, 1015 (1991); *People v. Casiano*, 212 Ill. App. 3d 680, 689, 571 N.E.2d 742, 748 (1991). When presented with a challenge to the sufficiency of the evidence, a reviewing court will not reverse a conviction unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt as to defendant's guilt. *Riley*, 219 Ill. App. 3d at 490, 579 N.E.2d at 1015; *Casiano*, 212 Ill. App. 3d at 689, 571 N.E.2d at 748. In a bench trial it is the function of the trial court to determine the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. *Riley*, 219 Ill. App. 3d at 490, 579 N.E.2d at

1015. Conflicting testimony is to be resolved by the trier of fact. *Riley*, 219 Ill. App. 3d at 491, 579 N.E.2d at 1015.

■ ■ Kidnaping occurs when a person knowingly and secretly confines another against her will or by force or threat of imminent force carries another from one place to another with intent to secretly confine her against her will. 720 ILCS 5/10—1 (West 1998); *People v. Ware*, 323 Ill. App. 3d 47, 54, 751 N.E.2d 81, 88 (2001). A kidnapper commits the offense of aggravated kidnaping when he inflicts great bodily harm or commits another felony upon his victim in the course of the kidnaping. 720 ILCS 5/10—2 (West 1998); *People v. Enoch*, 122 Ill. 2d 176, 194-95, 522 N.E.2d 1124, 1134 (1988). The secret confinement element of kidnaping may be shown by proof of the secrecy of either the confinement or the place of confinement. *Enoch*, 122 Ill. 2d at 195, 522 N.E.2d at 1134; *Riley*, 219 Ill. App. 3d at 487, 579 N.E.2d at 1013. "Secret confinement" is a necessary element of kidnaping under section 10—1(a)(1) of the Criminal Code of 1961 (720 ILCS 5/10—1(a)(1) (West 1998)). *Riley*, 219 Ill. App. 3d at 487, 579 N.E.2d at 1013. "Secret" denotes concealed, hidden, or not made public. *Riley*, 219 Ill. App. 3d at 487, 579 N.E.2d at 1013. Confinement is established where the victim has been clearly enclosed within something, most commonly, a house or a car. *Riley*, 219 Ill. App. 3d at 487, 579 N.E.2d at 1013.

■ To sustain a conviction of criminal sexual assault, there must be evidence that a defendant committed an act of sexual penetration, *i.e.*, any contact, however slight, between the sex organ of one person and the sex organ, mouth or anus of another person, by the use or threat of force or violence. 720 ILCS 5/12—13 (West 1998); *Casiano*, 212 Ill. App. 3d at 689, 571 N.E.2d at 748. Aggravated criminal sexual assault occurs if the accused commits criminal sexual assault and an aggravated circumstance as defined by the Criminal Code existed during the commission of the offense such as the threat or use of a dangerous weapon. 720 ILCS 5/12—14 (West 1998).

■ To determine whether an asportation or detention rises to the level of kidnaping as a separate offense, Illinois courts consider the following four factors: (1) the duration of the asportation or detention; (2) whether the asportation or detention occurred during the commission of a separate offense; (3) whether the asportation or detention that occurred is inherent in the separate offense; and (4) whether the asportation or detention created a significant danger to the victim independent of that posed by the separate offense. *People v. Smith*, 91 Ill. App. 3d 523, 529, 414 N.E.2d 1117, 1122 (1980); *Ware*, 323 Ill. App. 3d at 54, 751 N.E.2d at 88. A kidnaping conviction is not precluded by the brevity of the asportation or the limited distance of the movement.

*Ware*, 323 Ill. App. 3d at 54, 751 N.E.2d at 88. Whether an asportation is sufficient to constitute a kidnaping depends on the particular facts and circumstances of each case. *Ware*, 323 Ill. App. 3d at 54, 751 N.E.2d at 88.

In *People v. Casiano*, 212 Ill. App. 3d 680, 571 N.E.2d 742 (1991), the defendant was charged with forcing a victim to walk 1½ blocks to his apartment. Once inside the apartment, he sexually assaulted her. The court articulated the *Smith* factors and concluded, based upon the facts of that case, that the kidnaping was a separate offense and not merely incidental to the criminal sexual assault. While the court acknowledged that the asportation lasted only 1½ blocks, the " 'time involved in the movement or the distance it covers [were] not the determining factors' in whether the separate offense of kidnaping occurred. [Citation.]" *Casiano*, 212 Ill. App. 3d at 687. The court also determined that the asportation occurred prior to the assault and that the act of forcing the victim to walk 1½ blocks was not inherent in the offense of criminal sexual assault. Lastly, the court concluded that the asportation created a "significant danger to the victim independent of that posed by the sexual assault" because the defendant stuck a sharp object into her back and forced her to walk the distance in that manner, in addition to creating the threat of more serious criminal activity due to the privacy of defendant's apartment. *Casiano*, 212 Ill. App. 3d at 688.

In *People v. Williams*, 263 Ill. App. 3d 1098 (1994), the defendant accosted the two female complainants at a bus stop while he was in an automobile. He pointed a gun at them, told them he was a police officer and ordered them to get into his car. He drove to a nearby alley, handcuffed one of the complainants to the steering wheel, pointed his gun at the other complainant in the backseat and then forced the woman in the front passenger seat to perform fellatio on him and to have sexual intercourse. He then ordered the two women to change seats and sexually assaulted the second woman in the same manner. The court opined that the second and fourth *Smith-Casiano* factors favored defendant but believed that the first and third factors were qualitatively more compelling under the facts of that case because the detention lasted between 45 and 50 minutes and the defendant's criminal conduct "went beyond that required for the commission of the sexual assault crime." *Williams*, 263 Ill. App. 3d at 1107. The court went on to state that "each victim was detained both prior to and after being violated, significantly longer than the amount of time necessary to accomplish the defendant's sexual assault against her. This type of detention is not inherent in the sexual assault offense and indicates that the kidnaping of the victims was the result of

independent criminal conduct. While the kidnaping was certainly related to the sexual assault, these charges are sufficiently dissimilar to warrant distinct criminal convictions." *Williams,* 263 Ill. App. 3d at 1107.

In *People v. Lloyd*, 277 Ill. App. 3d 154 (1995), the victim was grabbed and taken to an abandoned building where she was raped by several men. She was then driven to a nearby vacant lot and sexually assaulted again. She was then driven to her apartment, where she was struck with a broken wine bottle. The court held that the duration factor was satisfied where the detention lasted approximately one block, and that "[n]either the brevity of the asportation nor the limited distance of the movement necessarily precludes a kidnaping conviction." *Lloyd*, 277 Ill. App. 3d at 164.

Secondly, the court found that the asportation of the victim occurred prior to, rather than during, the sexual assault, and thirdly, that the forced movement of the victim from one location to another place was not inherent in the offense of criminal sexual assault. Lastly, the court found that the asportation created a significant danger to the victim independent of the danger posed by the sexual assault. The court held that the "danger arises from the movement itself where [the victim] was grabbed from behind, threatened, and forced to walk in this manner. [Citation.] In addition, a significant danger arises from the potential of more serious criminal activity due to the privacy of the final location, the abandoned apartment building in the present case. Specifically, a significant and independent danger arises where a victim is forced out of a public area and into an abandoned apartment because as a result of the asportation, a victim's signal for help is more difficult to detect and the likelihood of a victim being seen by a passerby is greatly decreased." *Lloyd,* 277 Ill. App. 3d at 164-65. The court found that the kidnaping was not merely incidental to the sexual assault and, therefore, did not support a reduction of defendant's sentence.

Just recently, the second division of this district held that a kidnaping was not incidental to the sexual assault. In *People v. Jackson*, 331 Ill. App. 3d 279 (2002), the victim was walking down the street when defendant approached her and placed a gun against her rib cage and ordered her to get into his car. The victim was driven to an abandoned building where defendant sexually assaulted her. In affirming the conviction, the court held that the first *Smith* factor, *i.e.*, the duration of the asportation or detention, was satisfied because the defendant drove the victim for several miles to the abandoned building. While the court recognized that there was no testimony regarding the exact amount of time it took to transport the victim, it found that " 'a

kidnaping conviction is not precluded by the brevity of the asportation or the limited distance of the movement' " (*Jackson*, 331 Ill. App. 3d at 294, quoting *Ware*, 323 Ill. App. 3d at 54) and acknowledged that it had previously held that an asportation of less than one block and a detention of a few minutes were sufficient to support a separate kidnaping conviction.

The court also found that the second *Smith* factor was satisfied, *i.e.*, whether the asportation or detention occurred during the commission of a separate offense, because the asportation occurred prior to the sexual assault. The court found that the third *Smith* factor was satisfied, *i.e.*, whether the asportation or detention is inherent in the separate offense, because the asportation or detention of a victim is not an element of the offense of aggravated criminal sexual assault, and that the defendant committed a separate offense when he detained the victim and transported her against her will to the abandoned building. Lastly, the court found the fourth *Smith* factor to be satisfied because defendant's asportation of the victim posed a significant danger which was independent of the sexual assault because he was armed with a gun. The court found that the victim was not only threatened with the prospect of sexual assault but also with the prospect of death or injury.

■ Turning to the facts of the instant case, we find that most of the *Smith* factors are satisfied, thereby making a separate conviction for aggravated kidnaping proper. First of all, the duration of the asportation was for approximately 1¹/₂ miles and lasted between 5 and 10 minutes. Other cases have found the first *Smith* factor satisfied with considerably less distance involved in the asportation, *e.g.*, 1¹/₂ blocks. While the length of the detention was relatively short, it is well settled that a kidnaping conviction "is not precluded by the brevity of the asportation or the limited distance of the movement." *People v. Ware*, 323 Ill. App. 3d 47, 54, 751 N.E.2d 81, 88 (2001).

While at first glance the second factor may seem to favor defendant because the evidence established, at least through the testimony of the victim, that she was sexually assaulted as soon as she was pulled into the van, we find that the third and fourth factors heavily favor the State's position. The asportation and detention of a victim are not elements of the offense of aggravated criminal sexual assault. See 720 ILCS 5/12—14 (West 1998). While defendant argues that the asportation and detention were necessary to sexually assault the victim, we do not believe that is what is meant by the phrase "inherent in the separate offense." Some amount of asportation and detention occurs in so many sexual assault cases, presumably because the perpetrator, in order to avoid detection, must take his victim to a private place in

order commit the act. However, in order for the asportation or detention to be inherent in a separate offense, it must constitute an element of that offense. A person commits aggravated criminal sexual assault when he commits criminal sexual assault and caused bodily harm to the victim. 720 ILCS 5/12—14 (a)(2) (West 1998). Asportation and detention of the victim are not elements of that offense, and for that reason are not "inherent."

Lastly, the fourth *Smith* factor is satisfied because the asportation of the victim in a van posed a significant danger that was independent of the sexual assault. The facts demonstrate that the victim was struck repeatedly by defendants, including one time with a beer bottle, which caused a hematoma and lacerations about her head and face. Therefore, the victim was not only threatened with the prospect of sexual assault, she was also threatened with the prospect of severe injury, perhaps death. While the van was in motion her cries and screams could not be heard. When she did manage to escape by jumping from the moving vehicle, she sustained additional injuries to her ankle and arms. For these reasons, we conclude that the evidence was sufficient to sustain a conviction for aggravated kidnaping separate and apart from the offense of aggravated criminal sexual assault.

■ We shall now determine whether the defendants' sentences were proper. As a general rule, the failure to object to an alleged error at sentencing and in a postsentencing motion results in a waiver of that error on appeal. *People v. Marlow*, 303 Ill. App. 3d 568, 570, 708 N.E.2d 579, 581 (1999). However, sentencing errors affecting substantial rights may be analyzed under the doctrine of plain error, regardless of a defendant's failure to file a postsentencing motion. *People v. Tye*, 323 Ill. App. 3d 872, 887, 753 N.E.2d 324, 339 (2001). The plain error rule permits a reviewing court to take notice of errors that would otherwise be waived where the evidence is closely balanced or where the nature of the error is such as to deprive the accused of his constitutional right to a fair sentencing hearing. *Marlow*, 303 Ill. App. 3d at 570, 708 N.E.2d at 581. Plain error is a narrow and limited exception to the general waiver rule and should only be invoked where (1) the evidence is closely balanced or (2) the alleged error is so substantial that it deprived the defendant of a fair hearing. *Marlow*, 303 Ill. App. 3d at 570, 708 N.E.2d at 581. Where defendant neither argues the evidence was closely balanced nor explains why the errors were so severe that they must be remedied to preserve the integrity of the judicial process, he has waived any argument that plain error should apply. *Tye*, 323 Ill. App. 3d at 887, 753 N.E.2d at 339. We have reviewed the record and determined that defendants' waiver of this issue has not been overcome by the plain error doctrine.

Waiver aside, a sentence will be disturbed on appeal only if the sentencing court abused its discretion. *Tye*, 323 Ill. App. 3d at 887, 753 N.E.2d at 339. The appellate court defers to the trial court's decisions concerning sentencing and presumes that the trial court considered only appropriate factors in sentencing, unless the record affirmatively shows otherwise. *People v. Lurks*, 241 Ill. App. 3d 819, 827, 609 N.E.2d 894, 899 (1993).

The Illinois Constitution requires that penalties be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Center*, 198 Ill. App. 3d 1025, 1032-33, 556 N.E.2d 724, 729 (1990). This constitutional mandate calls for the balancing of the retributive and rehabilitative purposes of punishment. *Center*, 198 Ill. App. 3d at 1033, 556 N.E.2d at 729. This balancing process requires careful consideration of all factors in aggravation and mitigation, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well as the nature and circumstances of the crime and of defendant's conduct in the commission of it. *Center*, 198 Ill. App. 3d at 1033, 556 N.E.2d at 729. The trial judge is not required to detail precisely for the record the exact process by which she determined the penalty nor is she required to articulate her consideration of mitigating factors nor is she required to make an express finding that defendant lacked rehabilitative potential. *People v. Redmond*, 265 Ill. App. 3d 292, 307, 637 N.E.2d 526, 537 (1994). The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors such as the lack of a prior record, and the statute does not mandate that the absence of aggravating factors requires the minimum sentence be imposed. *Redmond*, 265 Ill. App. 3d at 307, 637 N.E.2d at 537.

Aggravated criminal sexual assault (720 ILCS 5/12—14 (West 1998)) and aggravated kidnaping (720 ILCS 5/10—2 (West 1998)) are Class X felonies that carry a sentence of not less than 6 years and not more than 30 years. 730 ILCS 5/5—8—1(a)(3) (West 1998). Conviction for aggravated criminal sexual assault mandates sentences run consecutively. 730 ILCS 5/5—8—4(a)(ii) (West 1998). Navarrete was sentenced 20 years for aggravated criminal sexual assault and 6 years for aggravated kidnaping. Quintana was sentenced 15 years for aggravated criminal sexual assault and 6 years for aggravated kidnaping. The trial court stated that Quintana's lack of a known criminal background was clearly a mitigating factor but that abducting a woman off the street in the middle of winter and subjecting her to humiliation, physical harm and multiple sexual assaults to the extent

that she had to jump out of a moving vehicle partially clad into the winter night required a sentence that would deter this kind of conduct. Regarding Navarrete, the trial court stated that the abduction and rape were as serious as it gets. Navarrete had a prior burglary conviction. Both defendants received the minimum sentence for aggravated kidnaping and less than the maximum for their aggravated criminal sexual assault convictions. Their sentences certainly suggest that trial court did not act arbitrarily in determining their sentences. The trial court properly weighed the appropriate aggravating and mitigating factors in reaching its decision. A reviewing court cannot substitute its judgment for that of the trial court merely because it may have balanced the appropriate factors differently from the trial court. *People v. Lamkey*, 240 Ill. App. 3d 435, 442, 608 N.E.2d 406, 411 (1992); *Redmond*, 265 Ill. App. 3d at 307, 637 N.E.2d at 537. The trial judge is in a better position to determine the punishment to be imposed. *Redmond*, 265 Ill. App. 3d at 306-07, 637 N.E.2d at 537. For that reason, this court will not disturb the sentences.

The defendant is entitled, however, to credit under the authority of section 5—8—7(b) of the Unified Code of Corrections for any part of any day he is in custody as a result of the offense for which sentence was imposed. 730 ILCS 5/5—8—7(b) (West 1998); *People v. Donnelly*, 226 Ill. App. 3d 771, 778, 589 N.E.2d 975, 980 (1992); *People v. Dieu*, 298 Ill. App. 3d 245, 249, 698 N.E.2d 663, 666 (1998). The mittimus currently reflects that defendant Navarrete spent 590 days in custody prior to sentencing. The State and defendant Navarrete are in agreement that Navarrete's mittimus should be corrected to reflect that he served a total of 609 days from the time of his arrest on January 22, 1999, through September 22, 2000. An amended mittimus may be issued at any time. *People v. Miles*, 117 Ill. App. 3d 257, 260, 453 N.E.2d 68, 69-70 (1983).

It has long been the rule in the State that a mittimus is not part of the common law record, that it is the judgment of the court which is the authority for the detention of the prisoner, and that in case of variance between the mittimus and the judgment, the latter will prevail. *Miles*, 117 Ill. App. 3d at 260, 453 N.E.2d at 69-70.

■ Defendants also argue that this court should order the issuance of a corrected mittimus reflecting that the judgment and sentence were entered on counts VII and IX, which were predicated on criminal sexual assault rather than on aggravated criminal sexual assault.

Defendants were charged with five counts of aggravated criminal sexual assault, four counts of aggravated kidnaping, one count of criminal sexual assault and two counts of kidnaping. The trial court found defendants guilty on all counts and entered judgment and

sentenced defendants on counts I and VI. Count I states that defendants committed the offense of aggravated criminal sexual assault in that they committed an act of sexual penetration upon L.D., to wit, contact between Navarrete's penis and L.D.'s vagina, by the use of force or threat of force and they used a dangerous weapon, to wit, a bottle, in violation of section 12—14(a)(1) (720 ILCS 5/12—14(a)(1) (West 1998)). Count VI states that defendants committed the offense of aggravated kidnaping in that they knowingly and secretly confined L.D. against her will and committed another felony, to wit, aggravated criminal sexual assault upon L.D., in violation of section 10—2(a)(3) (720 ILCS 5/10—2(a)(3) (West 1998)).

On September 22, 2000, during Navarrete's sentencing hearing the trial court stated: "Counts 1 through 5 are aggravated criminal sexual assault, different theories involving one penetration. Factually I know there were two penetrations. There was one, the defendant was not charged with the second penetration." The court stated further: "Then Count 6, 7, 8 and 9 is an aggravated kidnaping, which I basically—one charge with, you know, four different theories of aggravated kidnaping ***. So really the key sentencing on Count 1 and Count 6, that covers the basic charges. *** All the other Counts—Judgment is entered on all the other—on the sentence and all the other counts merge with—into Count 1 and Count 6." Inasmuch as the counts were merged, we find it unnecessary to amend the mittimus to reflect the entry of judgment on one of the other aggravated kidnaping counts which was not predicated on aggravated criminal sexual assault.

Based upon the foregoing analysis, the judgment of the circuit court is affirmed. The mittimus is corrected to reflect a sentencing credit of 609 days.

Affirmed.

HALL, P.J., and WOLFSON, J., concur.