**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2022 IL App (3d) 200002-U

Order filed November 30, 2022

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2022

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0002 Circuit No. 17-CF-950 |
| JOSHUA A. RUTLEDGE, | ) ) ) | Honorable Katherine S. Gorman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE DAUGHERITY delivered the judgment of the court.
Justices Holdridge and Hettel concurred in the judgment.

**ORDER**

¶ 1     *Held*: (1) The circuit court did not err in denying defendant's request to instruct the jury on involuntary manslaughter; (2) trial counsel was not ineffective; and (3) defendant's sentence was not excessive.

¶ 2     Defendant, Joshua A. Rutledge, appeals from the Peoria County circuit court's denial of his motion to reconsider sentence. Defendant argues the court erred in denying his request to instruct the jury on involuntary manslaughter, trial counsel was ineffective for failing to call two

witnesses that would support his uncorroborated defense, and his sentence was excessive. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4        Defendant was charged with first degree murder (720 ILCS 5/9-1(a)(2) (West 2016)) and aggravated battery (*id.* § 12-3.05(b)(1)) for the death of 17-month-old R.S. Defendant retained counsel.

¶ 5        Prior to trial, the State filed a motion, pursuant to section 115-21 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115-21 (West 2016)), to use the testimony of informant Leotis Bailey. At the hearing on the motion, defense counsel stated:

> "I just want to provide notes to the Court that depending on the Court's ruling on this there may be—there will be two witnesses we would writ over from the jail, and I told—I told the People that as well.
>
> That would be Marshall Anderson and Roy Payne, and I anticipate both their testimony would be that Mr. Bailey and Mr. Watts set this up and that this was manufactured by them, this story was manufactured by them to receive credit on their respective cases."

The court granted the State's motion. The case proceeded to a jury trial.

¶ 6        Hope S. testified that she was in a relationship with defendant. Hope and her 17-month-old son, R.S., lived with defendant. Hope worked at 1, 2, 3 You 'N Me Day Care (You 'N Me). R.S. attended You 'N Me. On October 16, 2017, Hope arrived at You 'N Me and dropped R.S. off in his classroom. After work, Hope and R.S. drove to defendant's house. R.S. rode in his car seat and acted normally during the drive.

¶ 7        At defendant's house, Hope watched television with R.S. before leaving for her shift at another job. When Hope left, R.S. was acting normal, alert, and active.

¶ 8        While at work, Hope received a call from defendant. Defendant told her R.S. had fallen and was hurt. Hope next saw R.S. in the intensive care unit (ICU). R.S. was unconscious, his face was swollen, and he had marks and bruises which had not been present when Hope last saw him. The doctors informed Hope that since R.S. had no brain activity they could no longer keep him on life support. R.S. died shortly after he was taken off life support on October 18, 2017.

¶ 9        The parties stipulated to the admission of evidence depositions from Lori Flores and Dr. Matthew Fox. Flores stated that she worked at You 'N Me on October 16, 2017. She periodically saw R.S. throughout the day. He was happy, having fun, and appeared to be behaving normally. Fox stated that he was a forensic pathologist and consulted for the Peoria County coroner's office. He performed an autopsy on R.S. Fox determined that R.S. had multiple blunt force injuries and that his death was caused by complications from a blunt force head injury.

¶ 10        Dr. Nabil Hassan, a pediatric ICU specialist, testified that he examined R.S. on October 16, 2017. R.S. had a linear fracture in his skull in the back of the occipital and parietal bones, bruising all over his body, and bilateral retinal hemorrhages in both eyes. Bilateral retinal hemorrhages indicated a nonaccidental injury. The skull fracture would have caused R.S. to show symptoms immediately, including loss of consciousness, seizure, lack of breathing, and loss of motor function and cognitive abilities. The State asked, "[W]ould the history of [R.S.] falling off of a 3 foot bed explain the injuries that you saw to [R.S.]?" Hassan answered:

"He had multiple injuries that I could not explain it by one impact of any sort whether it's shaken or a head or a fall because it's just the bruising was all over his body as you—you have the images that we took, and some of them look like a

3

little bit older than others so really there is no single mechanism that would explain all that."

On cross-examination, Hassan stated that shaken baby syndrome does not cause skull fractures. On redirect, Hassan testified that R.S. had a significant skull fracture that would require a remarkable level of force not explainable by a fall from three feet.

¶ 11        Keith Smith testified that he previously worked with defendant. On October 16, 2017, Smith received a phone call from defendant. Smith heard crying on the other end of the phone. Smith sent defendant a text message that read "Why you beating that baby? All I heard was screaming." On cross-examination, Smith testified he sent the message as a joke because he heard a child crying. Smith did not believe defendant was beating R.S. On redirect, Smith admitted that when he previously spoke with an investigator, he indicated that it sounded like a child was hurt.

¶ 12        Dr. Girish Deshpande, a pediatric ICU doctor, testified that he examined R.S. on October 18, 2017. R.S.'s injuries included a severe closed head injury; cardiopulmonaria; traumatic brain injuries; a skull fracture; multiple bruises over his face, trunk, and extremities; overall global hypoxic ischemic injuries resulting in shock; bilateral retinal hemorrhages consistent with shaken baby syndrome; brain death; no electric activity; no brain flow; and liver and pancreatic enzymes suggestive of injury to the abdominal organs. Additionally, the State elicited the following testimony from Deshpande:

    "Q. Could [R.S.] have received this brain injury from falling off a bed and onto the floor?

    A. No.

    Q. Could he have received it from jumping on a bed and falling on a toy?

4

A. No.

Q. Could he have received it from being carried and accidentally having his head hit on a door frame?

A. No.

Q. Could he have received it from jumping on a bed and falling and hitting his head on a dresser?

A. No.

Q. Would the injuries to [R.S.] be caused by gentle shaking to wake him up?

A. No.

Q. Accidentally laying him too hard on the floor?

A. No.

Q. What would account for [R.S.'s] brain injury?

A. This is a very forceful trauma to his head with a direct impact to the head because he had a skull fracture as well."

¶ 13        Sergeant Timothy Lemasters testified that he was dispatched to defendant's residence on October 16, 2017, to investigate an unresponsive child. Lemasters started his investigation in the child's bedroom. The floor in the bedroom was carpeted. The bed was one foot, seven inches off the floor. There were bloodstains on a several dresser drawers, a toy truck, and on the bedroom door frame. There was a small clump of hair below the bloodstain on the door frame. Lemasters found a wet wipe on the bed saturated with blood. In the living room, there were bloodstains in the Pack 'N Play, on a child's shirt found on the couch, and on the wall. The living room floor

was carpeted. In the kitchen, Lemasters observed bloodstains on the floor and wall. There were also bloodstains on the walls in the bathroom and on towels near the edge of the bathtub.

¶ 14        Forensic scientist Ann Yeagle testified that the blood found in defendant's residence was consistent with the DNA profile of R.S.

¶ 15        Briana Fagerberg, a teacher at You 'N Me, testified that she was assigned to R.S.'s classroom on October 16, 2017. R.S. did not have any marks or bruises on his face other than a small, faint bruise. R.S. was active, alert, and happy; and there was nothing unusual about his behavior. He did not sustain an injury while Fagerberg was present.

¶ 16        Taylor Lemons, a teacher at You 'N Me, testified that she worked in R.S.'s classroom on October 16, 2017. Lemons's testimony was consistent with Fagerberg's. Additionally, Lemons noted that she changed R.S.'s diaper that day and did not observe any bruises on his body.

¶ 17        After Lemons's testimony, the trial recessed for the day and the following conversation occurred:

> "[THE STATE]: Well, it might help if we were given kind of a more definitive state of the anticipated testimony of Anderson and Payne with dates in it because then it may not become—impeachment may not become an issue.
>
> [DEFENSE COUNSEL]: At this point I am not leaning to calling them.
>
> [THE STATE]: To Anderson?
>
> [DEFENSE COUNSEL]: I'm leaning to not call them.
>
> [THE STATE]: Okay. What about Payne?
>
> THE COURT: Neither of them?
>
> [DEFENSE COUNSEL]: I can't promise I won't, but at this point I am leaning not—I'm leaning towards not calling them."

6

¶ 18         Bailey testified that he met defendant in the Peoria County jail in early 2018. Defendant told Bailey that the night R.S. died he was "partying off of cocaine and marijuana." Hope brought R.S. to defendant's residence for defendant to babysit. Defendant put R.S. in his son's room while he made dinner. R.S. was making noise in the bedroom and defendant yelled at him several times to stop. R.S. continued making noise so defendant entered the bedroom, grabbed R.S., shook him hard, slapped him in the face, and threw him into the dresser. R.S. vomited on himself so defendant picked him up, intentionally hit his head on the door frame, and carried him into the bathroom. R.S. vomited again, his eyes rolled back in his head, and he went stiff. Defendant hid his drugs before calling the police because he was more concerned about them finding his drugs than he was about R.S. Defendant did not perform cardiopulmonary resuscitation (CPR) on R.S.

¶ 19         Detective Cody Wilson of the Peoria Heights Police Department testified that during his investigation into R.S.'s death, he interviewed defendant. The interview was video recorded and admitted into evidence. In the interview, defendant stated he may have set R.S. down on the floor too hard but was not sure because he panicked. He also told Wilson that he unintentionally hit the right side of R.S.'s head on the door frame as he carried R.S. out of the bedroom.

¶ 20         Investigator Timothy Moore testified that he interviewed Smith. In the interview, Smith stated that it sounded like R.S. was hurt on the October 16, 2017, phone call he received from defendant.

¶ 21         Dr. Channing Petrak, an expert in child abuse pediatrics, testified that she examined R.S. on October 17, 2017. R.S. had multiple bruises on his body and severe neurological impairment. Petrak opined that it was not possible for R.S. to receive these bruises from one fall. R.S. also had bruises on his neck. Petrak stated that the neck is difficult to bruise because bruising is

7

caused by breaking blood vessels deeper in the tissue and there is nothing firm in the neck to crush the blood vessels against. Petrak stated bruises on the neck are usually caused by significant compression or a direct blow, possibly squeezing.

¶ 22        Petrak opined that the bruises on R.S.'s arm were consistent with grab marks and the bruises on his back were consistent with R.S. having been thrown on the floor very hard. R.S.'s frenulum was torn which indicated he received a direct blow to his mouth. Petrak categorized R.S.'s skull fracture as complex and displaced which indicated it required more force than a typical fall. R.S. had severe bilateral retinal hemorrhages which are caused by rough shaking. Petrak opined that R.S.'s injuries could not be explained by a single fall. The State then elicited the following testimony:

"Q. I would like you to tell me if this scenario in your opinion to a reasonable degree of medical certainty would account for [R.S.'s] injuries.

If you were to assume that there was an angry or frustrated adult male who grabbed him, shook him very hard to where one eye was twitching, threw him into a wooden dresser, slapped him in the face, at that point [R.S.] began to vomit, picked [R.S.] up, carried him, hit his head intentionally against a wooden door frame, threw him hard on the floor, and then [R.S.] went stiff, is that in your opinion a scenario which would account for [R.S.'s] injuries as you saw them October 17th, 2017?

A. That would explain almost all of his injuries. Yes."

¶ 23        On cross-examination, Petrak testified that it would be very unusual for R.S. to be jumping at his age. Additionally. Petrak noted that the bruising on R.S.'s ear was highly specific of abuse.

8

¶ 24        Defendant testified that on October 16, 2017, he was working and denied "partying." He sent a text message to Hope that he was off work early and could watch R.S. Defendant went home and took a nap. He woke up to Hope carrying R.S. through the back door. Hope and R.S. watched television on the couch. A while later, Hope told defendant she had to get ready for work and left R.S. with defendant. Defendant put R.S. on the bed in his son's room and left the television on. Defendant entered the kitchen to make dinner. He heard an "uh-oh," then a "bam" followed by crying. Defendant ran into the bedroom.

¶ 25        Defendant testified that R.S. was between the dresser and the bed and lying on top of a toy. R.S.'s lip was bleeding so defendant took him to the living room to examine him. R.S. had a bruised ear, a bump and carpet burn on his forehead, and his lip was bleeding. Defendant put an ice pack on R.S.'s injuries and wiped his lip with a wet wipe. While defendant was putting the ice pack on R.S.'s forehead, he noticed a spot that appeared "mushy." Defendant gave R.S. a bath. According to defendant, while in the bathtub, R.S. played with a cup.

¶ 26        After the bath, defendant took R.S. into the living room and sat him on the floor. R.S. vomited on himself, so defendant rinsed him off in the bathroom. Defendant sat R.S. on the couch and he "went stiff." R.S. started biting on his tongue, so defendant tried to pry his mouth open. Defendant held R.S. and patted him on his back. When R.S. did not respond, defendant entered the bathroom and held R.S. under a cold shower. R.S. still did not respond so defendant placed him on the floor in the living room, began CPR, and called 911.

¶ 27        Defendant testified that he met Bailey in jail. Defendant's cellmate in jail was Darrell Watts who knew Bailey outside of jail. Defense counsel provided defendant with case notes which he kept in his jail cell. Defendant would leave the notes in his cell when he left. Defendant denied beating, harming, or killing R.S. Defendant stated that he was trying to help R.S.

9

¶ 28        On cross-examination, defendant clarified that the notes he kept in his jail cell were statements in his case. Defendant stated that he provided more detailed answers in his interview after Wilson provided him with information about R.S.'s injuries. Although defendant was not in the bedroom, he told dispatch what he theorized happened to R.S. because he panicked and was trying to help him.

¶ 29        Following defendant's testimony, the parties discussed jury instructions. Defense counsel proposed a jury instruction for involuntary manslaughter. The State objected. The State argued there was no evidence of a reckless act with a disregard for consequences. Defense counsel argued that defendant stated in his interview that he should not have left R.S. unsupervised in the bedroom. The State pointed out that defendant's testimony at trial was that he did not know what happened to R.S. and that R.S.'s death was an accident. Defense counsel responded that the jury could determine that it was reckless to leave a toddler in a bedroom unsupervised. The State replied that recklessness requires an act that consciously disregards known risks, and defendant testified that he did nothing to harm R.S. Defense counsel argued that defendant stated during his interview that he shook R.S. The court denied the instruction.

¶ 30        Defendant called child abuse pediatrician Dr. Marcus Degraw. Degraw testified that he reviewed R.S.'s medical records. Degraw opined that R.S.'s combination of injuries would necessitate a significant repetitive blunt force head trauma. Additionally, R.S.'s symptoms would have occurred within a few hours, with several occurring immediately. Symptoms would be an immediate loss of consciousness, vomiting, lethargy, poor feeding, looking "zoned out," and seizures. Degraw opined that R.S.'s bruises were not typical of accidental bruises.

¶ 31    On cross-examination, Degraw stated that he did not watch the video recording of defendant's interview but read the police reports summarizing it. The State elicited the following testimony:

"Q. *** And when you looked at the complete picture of [R.S.]—

A. Yes.

Q.—you determined that the trauma that he received was highly traumatic, repetitive, and severe; is that right?

A. Absolutely.

Q. And it was both the force of the trauma that he received as well as the number of impacts that he received contributed to this cascade of injuries which led to his death?

A. Absolutely. Yes.

Q. Okay. And his injuries, the ones [R.S.] received, were highly—highly specific for inflicted head trauma?

A. Absolutely. Yes.

Q. And inflicted means nonaccidental?

A. Correct.

Q. So [R.S.'s] brain injury was severe enough that he would not have been acting normally after he received it; is that right?

A. Yes.

Q. And you reviewed all of the police reports. Did those include all of the Defendant's statements about what happened to [R.S.]?

11

A. Yes.

Q. So you reviewed that the Defendant included or explained these by saying that [R.S.] was sitting on [a] dresser, fell, and busted his head?

A. Yes.

Q. He fell onto a plastic truck and hit his head and this plastic tractor was broken when he landed on it; correct?

A. Yes.

Q. And he was jumping on a child's bed, fell, and busted his head?

A. Yes.

Q. And he was standing on a kid's bed, looking out the window, and must of fallen off the bed?

A. Yes.

Q. And after [R.S.] went stiff, he shook [R.S.] two times to try to rouse him?

A. Yes.

Q. And that he may have laid him down too hard on the floor and hit his head?

A. Yes.

Q. And that he may have accidentally bumped his head on the wooden doorframe?

A. Yes.

Q. And you concluded that there was a complete lack of explanations to explain [R.S.'s] complex and deadly head injury; is that correct?

A. Absolutely. Yes.

Q. Yes. So I want you to take this hypothesis and tell—

A. Yes.

Q.—me what you think about this. I would like you to assume there's an angry adult male who grabs [R.S.], shakes him hard so hard that one of his eyes begins twitching.

He throws [R.S.] into a wooden dresser. [R.S.] lands on the floor. [R.S.] begins vomiting or puking. He picks [R.S.] up, deliberately runs [R.S.'s] head into a wooden doorframe, takes [R.S.] into the bathroom, takes his clothes off roughly, gives him a bath, throws him onto the floor, and then [R.S.] begins stiffing up, seizing, biting his tongue. Does that second scenario explain the injuries that [R.S] had?

A. Yes. That's [*sic*] scenario would absolutely explain his injuries."

¶ 32    Degraw was then asked to watch a video recording of R.S. leaving day care on October 16, 2017. The State then asked, "[I]n your opinion to a reasonable degree of medical certainty, did [R.S.] have this complex, severe, and deadly brain injury in that video?" Degraw answered, "[a]bsolutely not." On redirect, Degraw stated that it was possible R.S. was injured between leaving day care and arriving at defendant's home.

¶ 33    The jury found defendant guilty of both first degree murder and aggravated battery.

¶ 34    At defendant's sentencing hearing, the State called Bailey and Wilson to testify in aggravation. Bailey testified that defendant told him he previously physically abused R.S. when

13

he was upset with Hope. Defendant had been abusing R.S. for approximately four months prior to his death. Sometimes the abuse would leave scratch marks and bruises. Defendant would, depending on his mood, hit R.S. with a closed fist or an open hand. Defendant also threw toys at R.S., and "whooped the baby once or several times *** with a racetrack."

¶ 35 Wilson testified that he interviewed Stacy Wheeler, R.S.'s teacher. Wheeler informed Wilson that R.S. was not in school on August 24, 25, and 28 of 2017. When R.S. returned to school on August 29, 2017, he had black bruising on his ear and some bruising around the side of his face. The State admitted into evidence a text message conversation between defendant and Hope. The conversation read:

"[Defendant]: Ok how was [R.S.] at daycare

[Hope]: Good. cried when I left as always tho

[Defendant]: Daycare say he get beat u0

[Defendant]: Up

[Hope]: No they didn't say anything actually I'm sure they would I'll when I get hime"

¶ 36 Defendant did not present any evidence in mitigation. The court sentenced defendant to 58 years' imprisonment for first degree murder. The court stated:

"All right. The Court has considered the PSI, the evidence and arguments, [defendant's] letter, and the statutory factors in aggravation and mitigation, the history and character of the Defendant, and having due regard for the circumstances and nature of the offense, I find as follows.

In aggravation, [R.S.] was 17 months old. You were supposed to care for him. I don't know what the issues were between you and [Hope], but I sat through

14

the trial and I saw what happened to that little boy. I heard what you said as things evolved, [defendant], and throughout, it was clear to the Court that you did it and you panicked and you didn't know what to do when [R.S.] looked like he was dying.

The Court also believes that there were other incidents where you became frustrated with [R.S.] and you were physically abusive toward him.

[R.S.], at 17 months of age, was not in any position to protect himself, to even tell anyone that you were beating him. Instead, he was left with you and you beat him and then you tried to protect yourself.

Under no circumstances is it okay for the boyfriend of the mother of a child to kill that child, harm that child, do anything other than love and care for that child. You most certainly did not do that, [defendant] and it needs to be abundantly clear that that type of behavior will not be tolerated, period.

Your behavior after the fact and throughout since it occurred has demonstrated little, if any, remorse.

The Court has also considered in mitigation your lack of criminal record, the letters of support, your supporters here who probably can't believe that you did that, and the fact that you have contributed to your son's life in a positive way seemingly, but this conduct must be deterred in this case and perhaps this may deter others, [defendant].

[R.S.] will never see his second birthday, and that is because of you, so, [defendant], I'm going to sentence you to 58 years in the Department of Corrections with three years of mandatory supervised release."

15

The court did not enter a sentence on the other charge. The court denied defendant's motion to reconsider sentence. Defendant appeals.

¶ 37                                    II. ANALYSIS

¶ 38                                A. Jury Instruction

¶ 39        Defendant argues that the circuit court erred in denying his request to instruct the jury on involuntary manslaughter where there was evidence suggesting that defendant acted recklessly when he inflicted harm on R.S. that led to his death. Defendant concedes that he failed to preserve this issue, but he argues it is a reversible plain error.

¶ 40        "The plain-error doctrine is a narrow and limited exception." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010).

> "[T]he plain-error doctrine allows a reviewing court to consider unpreserved error when (1) a clear or obvious error occurred and the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) a clear or obvious error occurred and that error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence." *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007).

" 'In both instances, the burden of persuasion remains with the defendant.' " *Id.* (quoting *People v. Herron*, 215 Ill. 2d 167, 187 (2005)). The first step of the plain error doctrine is to determine whether a clear or obvious error occurred. *Id.*

¶ 41        We review a circuit court's determination whether there is insufficient evidence to justify giving a jury instruction for an abuse of discretion. *People v. McDonald*, 2016 IL 118882, ¶ 42. "An abuse of discretion occurs only when the trial court's decision is arbitrary, fanciful, or

16

unreasonable or where no reasonable person would take the view adopted by the trial court." *Seymour v. Collins*, 2015 IL 118432, ¶ 41.

¶ 42     "[I]n order for a defendant to be entitled to a lesser-included offense instruction, 'the evidence must be such that a jury could rationally find the defendant guilty of the lesser offense, yet acquit him of the greater.' " *People v. Wilmington*, 2013 IL 112938, ¶ 47 (quoting *People v. Medina*, 221 Ill. 2d 394, 405 (2006)).

¶ 43     "A person who unintentionally kills an individual without lawful justification commits involuntary manslaughter if his acts whether lawful or unlawful which cause the death are such as are likely to cause death or great bodily harm to some individual, and he performs them recklessly." 720 ILCS 5/9-3(a) (West 2016).

> "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense, and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." *Id.* § 4-6.

¶ 44     "The difference between first degree murder and involuntary manslaughter lies in the defendant's mental state." *McDonald*, 2016 IL 118882, ¶ 51. Defendant was charged with first degree murder and aggravated battery. The murder charge alleged that defendant, without lawful justification, knowingly struck the head of R.S. knowing said act created a strong probability of great bodily harm to R.S. thereby causing his death. 720 ILCS 5/9-1(a)(2) (West 2016). " 'Knowledge' is a conscious awareness that one's conduct is practically certain to cause a particular result." *McDonald*, 2016 IL 118882 ¶ 51.

17

"Certain factors, while not dispositive, may be considered in deciding whether an involuntary manslaughter jury instruction is warranted: (1) the disparity of size and strength between the defendant and the victim, (2) the duration of the altercation and the severity of the victim's injuries, (3) whether the defendant used a weapon, (4) whether the defendant inflicted multiple wounds, and (5) whether the victim was defenseless." *Id.* ¶ 52.

¶ 45 Here, the severity of the beating and disparity in size between R.S. and defendant negates any suggestion that defendant's conduct was only reckless. See *People v. Ward*, 101 Ill. 2d 443, 451-52 (1984) ("A blow from a bare fist can result in murder where *** there is great disparity in size and strength between the defendant and the victim."). All of the medical evidence presented at trial, established that R.S. died as a result of a severe beating which was nonaccidental. Moreover, Degraw and Deshpande both determined that defendant's accounts did not explain R.S.'s complex and lethal head injury. Degraw, defendant's medical expert, specifically determined R.S.'s injuries were severe, repetitive, and nonaccidental. Additionally, Bailey's testimony amounted to an admission by defendant that he knowingly harmed R.S. Thus, the evidence readily established that defendant acted knowingly, which negated an involuntary manslaughter instruction.

¶ 46 The court did not abuse its discretion by denying defendant's request to instruct the jury on involuntary manslaughter because a rational jury could not find defendant acted only recklessly. Accordingly, there is no error, let alone a reversible plain error.

¶ 47 B. Ineffective Assistance of Counsel

18

¶ 48     Defendant argues he received ineffective assistance where counsel failed to call two witnesses who would support defendant's otherwise uncorroborated defense that he did not harm R.S.

¶ 49     To state a claim of ineffective assistance of counsel, a defendant must show that counsel's performance was deficient and that the deficient performance prejudiced defendant. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Failure to establish either prong is fatal to the claim. *Id.* at 697. Whether counsel is ineffective is a question of law that is subject to *de novo* review. *People v. Hale*, 2013 IL 113140, ¶ 15. "Decisions concerning what witnesses to call and what evidence to present on a defendant's behalf are viewed as matters of trial strategy. Such decisions are generally immune from claims of ineffective assistance of counsel." *People v. Munson*, 206 Ill. 2d 104, 139-40 (2002). "The only exception to this rule is when counsel's chosen trial strategy is so unsound that counsel entirely fails to conduct any meaningful adversarial testing." *People v. Reid*, 179 Ill. 2d 297, 310 (1997).

¶ 50     Here, counsel's decision not to call Anderson and Payne was a matter of trial strategy. Although counsel initially indicated before trial that he might call the two witnesses to testify, counsel ultimately decided against calling them. Indeed, there is no indication in the record that Anderson and Payne's testimony would support defendant's trial defense that he did not murder R.S. Trial counsel noted on the record that he anticipated Anderson and Payne would testify that Bailey fabricated his testimony to receive credit in his case. Counsel ultimately decided against calling either of these witnesses. Defendant has not established that this strategic decision was so unsound that it undermined counsel's advocacy. Moreover, even if defendant established that counsel's decision was deficient, he cannot establish prejudice. The evidence of defendant's guilt is overwhelming. Several experts testified that R.S. died because of severe, nonaccidental

19

trauma. Additionally, Hope, Flores, Fagerberg, and Lemons all testified that R.S. was healthy, and behaving normally, prior to being placed in defendant's care on October 16, 2017.

¶ 51                                    C. Excessive Sentence

¶ 52        Defendant argues he received an excessive sentence where the circuit court put undue weight on deterrence and inadequately considered evidence in mitigation.

¶ 53        "It is well settled that a trial judge's sentencing decisions are entitled to great deference and will not be altered on appeal absent an abuse of discretion." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). A reviewing court "must not substitute its judgment for that of the trial court simply because the reviewing court would have weighed the factors differently." *Id.* at 800-01. A sentence that falls within the statutorily prescribed range is presumptively valid (*People v. Busse*, 2016 IL App (1st) 142941, ¶ 27), and "is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense" (*People v. Franks*, 292 Ill. App. 3d 776, 779 (1997)).

¶ 54        The sentencing range for first degree murder is 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20 (West 2016). Since defendant's sentence of 58 years' imprisonment is within the applicable range, it is presumptively valid. See *Busse*, 2016 IL App (1st) 142941, ¶ 27.

¶ 55        " 'A trial court has wide latitude in sentencing a defendant, so long as it neither ignores relevant mitigating factors nor considers improper factors in aggravation.' " *People v. Flores*, 404 Ill. App. 3d 155, 157 (2010) (quoting *People v. Roberts*, 338 Ill. App. 3d 245, 251 (2003)). "The existence of mitigating factors does not obligate the trial court to impose the minimum sentence" (*People v. Garibay*, 366 Ill. App. 3d 1103, 1109 (2006)), and does not preclude it from imposing the maximum sentence (*People v. Pippen*, 324 Ill. App. 3d 649, 652 (2001)). The absence of aggravating factors does not require the circuit court to impose the minimum

sentence. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). We presume the court considered the relevant factors and mitigation evidence presented. *People v. Wilson*, 2016 App (1st) 141063, ¶ 11. The court is not required to "recite and assign a value to each factor." *Id.* It is defendant's burden to show that the court did not consider the relevant factors. *Id.*

¶ 56    Here, it is clear from the record the circuit court considered the factors in aggravation and mitigation. In aggravation, the court found that defendant was caring for the 17-month-old R.S. immediately before R.S.'s death. R.S. could not protect himself, and the evidence indicated that defendant had physically abused R.S. on prior occasions. Following the murder, defendant showed little remorse. In mitigation, the court specifically found that defendant lacked a criminal record and had several letters of support. Ultimately, however, the court's comments indicated that the severity of the offense warranted a substantial sentence. See *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12 ("[I]t is the seriousness of the crime–rather than the presence of mitigating factors–that is the most important factor in determining an appropriate sentence."). The "court is not required to give defendant's rehabilitative potential more weight than the seriousness of the offense." *People v. Nussbaum*, 251 Ill. App. 3d 779, 781 (1993).

¶ 57    In essence, defendant is asking us on appeal to reweigh the above factors and substitute our judgment for that of the circuit court. However, we "[will] not substitute [our] judgment for that of the trial court simply because [we may] have weighed the factors differently." *Jackson*, 375 Ill. App. 3d at 800-01. Accordingly, the court did not abuse its discretion in sentencing defendant to 58 years' imprisonment for such a heinous crime.

¶ 58                                III. CONCLUSION

¶ 59    The judgment of the circuit court of Peoria County is affirmed.

¶ 60    Affirmed.