2020 IL App (2d) 190206-U
No. 2-19-0206
Order filed September 3, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 15-CF-449 |
| KIM JOHNSON, | ) ) ) | Honorable Liam C. Brennan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE SCHOSTOK delivered the judgment of the court.
Justices Zenoff and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*: The trial court did not abuse its discretion in sentencing defendant to the minimum prison term of four years, rather than probation, on her conviction for theft by deception. While there was mitigating evidence of defendant's devotion to her family and her community involvement, she had a significant role in an expansive fraudulent scheme involving identity theft, and probation would deprecate the seriousness of the offense.

¶ 2   Defendant, Kim Johnson, appeals her sentence for theft by deception of over $100,000 (720 ILCS 5/16-1(a)(2)(A) (West 2014)). She contends that her four-year prison sentence is excessive and that she should be resentenced so that the court may consider her health in light of the COVID-19 pandemic. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     On December 20, 2018, defendant pleaded guilty to theft by deception and other charges against her were dismissed. The factual basis for the plea was that defendant worked in concert with other individuals who wrote checks to Jewel-Osco (Jewel) to buy merchandise and gift cards on bank accounts that they did not own. The total loss to Jewel was over $100,000 but less than $500,000.

¶ 5     At sentencing, Detective David Sears testified that he interviewed a woman who reported that she and her boyfriend began receiving collection notices from Jewel for delinquent checks two weeks after their driver's licenses were stolen. Working with Matthew Withey, a senior security manager for Jewel, Sears determined that three different women were writing the checks and that, when they left the store, they would get in a vehicle that was registered to defendant.

¶ 6     When one of the women, Latese Grant, was arrested, she told Sears that she lived in defendant's basement and was part of a crew of people who met daily at defendant's house. The group would take stolen driver's licenses and checkbooks that were purchased by defendant and would then alter the licenses and print new names on the checkbooks to match. Designated check writers would go out daily to purchase items, some of which were returned at a different time. The group would go to seven or eight stores per day and could write checks up to $2000 per day. They returned to defendant's home with the proceeds.

¶ 7     A search of defendant's vehicle revealed 13 driver's licenses that appeared to be altered. In defendant's bedroom, Sears found multiple gift cards, identification cards for defendant and her husband, and 65 checkbooks. Fifty to fifty-five of the checkbooks had either defendant's name, her husband's name, or her daughter's name on them. The others bore names of people who were not members of the household. In the dining room, Sears found 75 driver's licenses, none of which

were for people who lived in the house. In the basement, Sears found a printer, three or four computers, and a sheet of paper with Grant's identification copied on it. Withey testified that over 750 delinquent checks were passed at Jewel by the same three or four women. The State argued that defendant orchestrated an elaborate scheme, and it recommended an eight-year sentence of incarceration.

¶ 8 The presentence investigation report (PSI) showed that defendant was previously convicted of three misdemeanor thefts in 1977, 1985, and 1989. She was convicted of forgery in 1999 and sentenced to probation. In 2004, she was convicted of possession of a fraudulent identification card and sentenced to supervision, which was later revoked. Also in 2004, she was convicted of forgery and sentenced to probation. She had two pending retail theft cases. Defendant was married with 12 adult children. She was the caregiver for her 88-year-old mother. Defendant was 59 years old and suffered from high blood pressure, migraines, and depression. She also experienced irregular heartbeats and chest pains. She took eight daily medications.

¶ 9 Defendant denied direct involvement with the check-writing scheme and specifically denied being the ringleader. However, she also told the PSI investigator that, though she did not accompany the others to the stores, she felt responsible for enabling them to commit the crimes. She admitted that she "allowed them to use [her] home, [her] car, and [her] advice to carry on as they did." She admitted to making it easier for the others to commit the crimes and that she sometimes benefitted from their criminal activities by getting groceries or clothing. She said that she hid the activity from her family. The investigator recommended a sentence of probation conditioned on payment of restitution.

¶ 10 Defendant provided letters of support describing her as a loyal, dependable, and caring person. For example, an outreach specialist with the Institute for Non-Violence Chicago wrote

that defendant was active in the community and supported those in need by sponsoring free school supply drives, helping seniors, and organizing food basket giveaways during the holidays. The former teacher of one of defendant's children wrote that defendant had engaged in community outreach as the school's PTA president. Defendant's daughter wrote about defendant's good character and her care of her mother and 16 grandchildren. Defendant had been given the Grandparent of the Year Award from the school district.

¶ 11    Defense counsel joined in the PSI investigator's recommendation of probation. Counsel claimed that defendant was not the "mastermind" of the scheme and "couldn't pay attention to what those people in her basement were doing day-to-day" because she was taking care of her elderly mother.

¶ 12    Defendant gave a statement in allocution, expressing remorse and stating that she had been trying to help others who had nowhere to live. She claimed that some of those who were charged in the case had been brought to her home by the police "because they got put out, they didn't have no clothes, they had nothing." Defendant claimed that "this *** really hurts because [she] never wanted any of this to happen, and [she] didn't even know it was really this much, [that] all this was really going on."

¶ 13    The trial court noted the "compelling" letters presented in mitigation. Though defendant was "not the mastermind of the entire caper," she was not "the innocent person who just lent her house to people who took advantage of her." Rather, based on the number of checkbooks found in defendant's bedroom that were in her name or the names of her family members, her involvement was more than she suggested. The court also noted that the crimes involved were more than a "garden variety retail theft" but rather encompassed hundreds of identity thefts. Ultimately, the court found that probation would deprecate the seriousness of the offense and be

inconsistent with the ends of justice. See 730 ILCS 5/5-6-1(a)(2) (West 2014). The court sentenced defendant to four years' incarceration and ordered her to pay restitution in the amount of $24,300, representing her share among the multiple people involved in the crime. Defendant's motion to reconsider the sentence was denied, and she appeals.

¶ 14                                                    II. ANALYSIS

¶ 15    Defendant contends that her sentence was excessive and that she should be resentenced for the court to consider her health issues in light of the COVID-19 pandemic.

¶ 16    We address first defendant's contention that the trial court abused its discretion by sentencing her to incarceration rather than probation. "[T]he trial court is in the best position to fashion a sentence that strikes an appropriate balance between the goals of protecting society and rehabilitating the defendant." *People v. Risley*, 359 Ill. App. 3d 918, 920 (2005). Thus, we may not disturb a sentence within the applicable sentencing range unless the trial court abused its discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). A sentence is an abuse of discretion only if it is at great variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense. *Id.* at 210. We may not substitute our judgment for that of the trial court merely because we might weigh the pertinent factors differently. *Id.* at 209.

¶ 17    In determining an appropriate sentence, relevant considerations include the nature of the crime, the protection of the public, deterrence and punishment, and the defendant's rehabilitative prospects. *People v. Kolzow*, 301 Ill. App. 3d 1, 8 (1998). The weight to be attributed to each factor in aggravation and mitigation depends upon the circumstances of the case. *Id.* "The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). It is not mandatory that the trial court recite all the factors before imposing a sentence. *People v. Spicer*,

379 Ill. App. 3d 441, 469 (2007). It is also presumed that the court considered all the factors unless the record indicates the contrary. *Id.* A sentence of probation is not an inherent or statutory right and instead is a discretionary matter for the trial court. *People v. Brown*, 218 Ill. App. 3d 890, 900 (1991).

¶ 18     Here, defendant was convicted of a Class 1 felony. 720 ILCS 5/16-1(b)(6) (West 2014). She was eligible for probation (730 ILCS 5/5-4.5-30(d) (West 2014)), but if instead the court chose to impose a prison term, the range was 4 to 15 years (*Id.* 5-4.5-30(a)). The court found that defendant was more involved in the crimes than she suggested. That finding was well supported by the use of defendant's vehicle in the thefts, the presence of checkbooks and driver's licenses in her bedroom and dining room, and her admission that she accepted proceeds of the thefts. The court also properly considered the seriousness of the crime and defendant's criminal history in which she was previously sentenced to probation and yet committed additional crimes. Meanwhile, the court considered the mitigating evidence, including the length of time since her last conviction, the letters provided in mitigation, and her role as a caregiver. The court then sentenced defendant to the minimum term of incarceration.

¶ 19     Defendant argues that the trial court's lower restitution calculation shows that the crime was less serious, but the court was simply apportioning the amount based on the multiple people involved in the offense. Defendant also suggests that the court inappropriately considered an uncharged crime when it referenced hundreds of identity thefts, but that was an appropriate comment as to the seriousness of the crime, which involved a scheme using numerous stolen driver's licenses. The court's determination that a sentence of probation would deprecate the seriousness of the offense and be inconsistent with the ends of justice was not an abuse of discretion.

¶ 20   Defendant also argues that she should be resentenced for the court to consider her health in light of the COVID-19 pandemic.   However, defendant concedes that she was placed on furlough and would be released from incarceration on July 31, 2020.  A search of the Department of Corrections website verifies that she was indeed paroled on that date.  See *People v. Young*, 355 Ill. App. 3d 317, 321 n.1 (2005) ("[W]e may take judicial notice of information that the Department of Corrections has provided on its website.").  Accordingly, we find the issue to be moot.  See *People v. McNulty*, 383 Ill. App. 3d 553, 558 (2008).

¶ 21                                  III. CONCLUSION

¶ 22   For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

¶ 23   Affirmed.