2021 IL App (1st) 190412-U

No. 1-19-0412

Order filed February 26, 2021

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 14 CR 19985 |
| | ) | |
| NOE MATAMOROS, | ) | Honorable |
| | ) | Alfredo Maldonado, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE JOHNSON delivered the judgment of the court.

Justices Sheldon Harris and Maureen Connors concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm defendant's conviction and sentence over his contention that the sentence was excessive.

¶ 2    Following a jury trial, defendant Noe Matamoros was found guilty of two counts of predatory criminal sexual assault of a child (PCSA) (720 ILCS 5/11-1.40(a)(1) (West 2014)) and two counts of aggravated criminal sexual assault (ACSA) (720 ILCS 5/11-1.60(b) (West 2014)).

The trial court merged one of the ACSA counts into one of the PCSA counts and sentenced him to consecutive prison terms of nine years on each of the PCSA counts and a concurrent prison term of six years on the remaining ACSA count. Defendant appeals, contending his sentence was excessive. We affirm.

¶ 3     The State charged defendant by indictment with, *inter alia*, two counts of PCSA and three counts of ACSA, alleging defendant, who was over 18 years of age, committed various sexual offenses on his five-year-old niece, N.L., all of which occurred between October 1, 2013, and September 7, 2014.[1] Specifically, the two PCSA counts alleged there was contact between defendant's penis and N.L.'s hand (count I) and penetration of N.L.'s mouth by defendant's penis (count II). The three ACSA counts alleged defendant, for the purpose of sexual arousal or gratification, touched his penis to N.L.'s hand (count VI), touched his mouth to N.L.'s mouth (count VII), and touched his hand to N.L.'s sex organ (count VIII).

¶ 4     Prior to trial, the State extended a plea offer to defendant, under which, in exchange for his guilty plea on count IX of the indictment, which charged him with the Class 2 felony of ACSA based on his touching his penis to N.L.'s hand for the purpose of sexual arousal or gratification, he would be sentenced to seven years' imprisonment to be served at 50%.[2] After the trial court admonished defendant in accordance with *People v. Curry*, 178 Ill. 2d 509 (1997), he rejected the State's offer.

¶ 5     The State also filed a pretrial motion to admit hearsay statements pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2014)), in which

---

[1] The State dismissed the remaining counts of the indictment prior to trial.
[2] The State did not proceed to trial on count IX.

it sought to admit (1) a statement made by N.L. to her mother, Tilza Velazquez, which included drawings made by N.L., and (2) a video recorded and transcribed interview of N.L. at the Chicago Children's Advocacy Center.[3] After a hearing, the trial court granted the State's motion with respect to both statements. The matter proceeded to a jury trial, at which the following evidence was presented.

¶ 6    Velazquez testified she and Fernando Lopez had been married for 10 years and had three children, the oldest of whom was N.L., who was born on March 23, 2009 and at the time of trial was nine years old. Her other two children were H.L. and I.L., who were six years and nine months old, respectively, at the time of trial.

¶ 7    Velazquez and Lopez were separated between the fall of 2013 and fall of 2014 and, at that time, Lopez lived with his sister, who was married to and lived with defendant. At that time, Velazquez had two jobs and, when she needed childcare, she would take N.L. and H.L. to defendant's house. She also took N.L. and H.L. to defendant's house on the weekends so Lopez could have visitation with them.

¶ 8    On September 20, 2014, Velazquez watched a movie with N.L. and H.L. After the movie finished, she and N.L. went into the kitchen, where she began to make food and N.L. began to dance in front of a mirror. N.L. told Velazquez she and defendant, to whom she referred as "Uncle Noe," had a secret but she could not tell Velazquez because defendant would stop loving her. Velazquez told N.L. she would not get angry. N.L. then took Velazquez into her bedroom, made Velazquez "pinky promise," and told Velazquez she and defendant were boyfriend and girlfriend. Velazquez told N.L. she was too young to have a boyfriend and asked how they were boyfriend

_____

[3] Tilza Velazquez is also identified as Otilda Velazquez and Lisa Velazquez in the record.

and girlfriend. N.L. told her that she and defendant gave each other kisses on the mouth and that defendant touched her "in [her] little part," indicating her vagina.

¶ 9     N.L. then took a piece of paper from her backpack and began drawing pictures of what her and defendant had done. Velazquez authenticated the drawings, which were admitted into evidence and published to the jury. Velazquez then described what each drawing depicted based on what N.L. told her. The drawings depicted defendant's penis and N.L.'s vagina touching, defendant's mouth on her vagina, her mouth on defendant's penis, and defendant and N.L. kissing on the mouth.[4] Velazquez immediately contacted the police and, about nine days later, took N.L. to the Children's Advocacy Center in Chicago for a forensic interview.

¶ 10     Velazquez also testified that, in the month leading up to September 20, 2014, she noticed a change in N.L.'s behavior. For example, she observed N.L. rubbing her vagina on the "middle part of [a shopping] cart." When Velazquez asked N.L. why she did so, N.L. responded "because it tickle[d] her in her little thing." In addition, N.L. "would all of a sudden *** try to give [H.L.] a kiss on the mouth."

¶ 11     The State presented stipulations, which laid the foundation and authenticated a video recording and Spanish-to-English transcription of the forensic interview of N.L. that was conducted by Marilyn Soto at the Children's Advocacy Center in Chicago. The video recording and transcription were admitted into evidence and the video recording was published to the jury.

¶ 12     N.L., who was five years old at the time of the interview, told Soto that defendant kissed her on the mouth "like a boyfriend" every day. She also told Soto that defendant touched her vagina

---

[4] N.L. used the word "cosita," which means "little thing," to refer to both her vagina and defendant's penis.

with his hand every day. Defendant also put his penis on her vagina and in her mouth, both of which happened "many times." The incidents occurred when N.L. was four and five years old.

¶ 13    N.L. testified that she has an uncle named "Noe" but was unable to identify him in open court. However, she identified defendant in a photograph which was taken shortly after his arrest in October 2014.

¶ 14    When N.L. was four or five years old, she and her sister would go to her uncle Noe's house, where he lived with her aunt and two cousins, when her parents "had things to do." When she went to Uncle Noe's house, he forced his "private part" into her mouth. After that happened, Uncle Noe told N.L. that he would "put [her] mom and dad to jail" if she told anyone. N.L. told her mom what happened, and she drew pictures depicting it. At trial, N.L. did not remember everything that happened between her and Uncle Noe.

¶ 15    Detective Manuel De La Torre testified he investigated this case and learned that, on October 14, 2014, defendant was in police custody. After defendant waived his Miranda rights (*Arizona v. Miranda*, 384 U.S. 436 (1966)), he interviewed defendant around 10 p.m. that day, and defendant did not make any admissions regarding inappropriate contact between him and N.L.

¶ 16    The next day, on October 15, 2014, De La Torre again interviewed defendant. The interview was video recorded and then transcribed from Spanish into English. De La Torre authenticated the video recording and transcription, which were admitted into evidence.[5] The recording was published to the jury.

---

[5] The State also presented a stipulation verifying the accuracy of the Spanish-to-English transcription.

¶ 17    During the second interview, defendant again waived his *Miranda* rights and agreed to speak to De La Torre. Defendant told De La Torre that he did not force N.L. to do anything but admitted that N.L. touched his penis two times and placed it in her mouth once. He also admitted he rubbed her vagina once over her clothes. He denied kissing N.L. and placing his penis on her vagina.

¶ 18    The State rested and defendant moved for a directed verdict, which the trial court denied.

¶ 19    N.L.'s father, Lopez, testified that, in 2014, he and Velazquez were separated and, at that time, he lived with his sister and defendant. N.L. would come to visit him weekly. Around Labor Day in 2014, he discovered N.L. watching a pornographic video depicting oral sex on defendant's cell phone.

¶ 20    The jury found defendant guilty of PCSA alleging contact between defendant's penis and N.L.'s hand (count I), PCSA alleging penetration of N.L.'s mouth by defendant's penis (count IV), ACSA alleging contact between defendant's penis and N.L.'s hand (count VI), ACSA alleging contact between defendant's hand and N.L.'s sex organ (count VIII), and not guilty of ACSA alleging contact between defendant's mouth and N.L.'s mouth (count VII). Defendant filed a supplemented motion for new trial, which the trial court denied.

¶ 21    Before sentencing, the trial court ordered that a presentence investigation report (PSI) be prepared for defendant. The PSI indicated that defendant was 28 years old at the time of the offense and had emigrated from Honduras to the United States in 2001. Defendant reported he worked for Luna Carpeting for five years before his arrest in this case and earned $1200 per week installing carpets. He was previously employed through Labor Solutions and earned $360 per week, held side jobs as a mechanic, and desired to open a mechanic shop. The PSI also indicated that

defendant was in an eight-year relationship with his girlfriend, Flordeliz Padilla, with whom he had an eight-year-old son and five-year-old daughter. He also had a five-year-old daughter from another relationship.

¶ 22    With respect to defendant's criminal history, the PSI indicated he (1) pleaded guilty to retail theft in 2012, for which he was sentenced to three months' court supervision; (2) pleaded guilty to a terrorist threat of a family or household member in 2005 in Texas, for which he was sentenced to "6 months confinement"; (3) pleaded guilty to theft in 2003 in Texas, for which he was sentenced to "10 days confinement"; and (4) was charged with "Fail to Identify Giving False/Fictitious Info" in 2008 in Texas, absconded, and had a warrant for his arrest.

¶ 23    At the sentencing hearing, the State informed the court it did not intend to present a victim impact statement, stating it had been in contact with the family and, "[b]ecause this [was] a familial issue, [that had] caused a lot of strain," the family had declined to provide a victim impact statement.

¶ 24    Defendant presented the testimony of his brother, Gabriel Matamoros, and Padilla. Gabriel testified that defendant had been in the United States since 2001 and continuously worked installing carpets to support his family in Honduras.[6] He also testified that defendant's imprisonment has had a negative effect on defendant's children. Padilla testified she had known defendant since 2008 and had with him an eight-year-old son and four-year-old daughter, with whom he had a "perfect" relationship and to whom he was "an excellent dad." She also testified

---

[6] Because defendant and his brother share the same last name, we refer to defendant's brother by his first name to avoid confusion.

defendant was their home's primary breadwinner and that the family "need[ed] him," and that his incarceration had a negative effect on his children.

¶ 25    In aggravation, the State noted N.L. was five years old at the time defendant abused her, that "[t]his was a familial relationship," and defendant had a minor criminal history out of Texas. After realizing that defendant was required to serve consecutive sentences on each of the PCSA convictions, the applicable sentencing range for each PCSA conviction was 6 to 60 years, and the ACSA sentence would be served concurrently, the State asked the court to impose "an appropriate sentence."

¶ 26    In mitigation, defense counsel argued defendant was an integral part of his family: providing financial support to both his family in the United States as well as in Honduras. Counsel further noted that his incarceration had negatively affected his children. In light thereof, Counsel requested the court impose the minimum sentence.

¶ 27    In allocution, defendant stated, "All of the things they spoke about are not true, your Honor," and asked the trial court to "give [him] a chance" to show society he was "not like that." He further stated that he wanted to be with his children and help his family, that he came to the United States to work, and that he would never harm a child.

¶ 28    The trial court merged count VI (ACSA alleging contact between defendant's penis and N.L.'s hand) into count I (PCSA alleging contact between defendant's penis and N.L.'s hand). The court noted it had considered the evidence presented at trial and sentencing; the information included in the PSI; defendant's history, character, and attitude; the parties' arguments in aggravation and mitigation; the statutory factors in aggravation and mitigation; and the circumstances of the offenses of which defendant had been convicted. The court noted that, while

defendant's statement, that he was deserving of a chance, was a fair statement, N.L. deserved far better than what happened to her. The court found the evidence of defendant's guilt was overwhelming and noted that it understood "the issues presented *** in mitigation." Further, the court recognized defendant had "quite a bit of mitigation" which it did not ignore: specifically, that he came to the United States and worked, contributed to society, and raised a family which loved him. The court also stated it understood the family had been fractured but noted it was defendant's actions, in taking N.L.'s innocence from her, that caused the fracture. Accordingly, the court sentenced him to consecutive terms of nine years' imprisonment on both PCSA convictions and a concurrent term of six years' imprisonment on the remaining ACSA conviction.

¶ 29    Defendant filed a motion to reconsider sentence, which the trial court denied. This appeal followed.

¶ 30    On appeal, defendant argues the trial court abused its discretion by sentencing him to an aggregate term of 18 years' imprisonment. He does not dispute the imposition of consecutive sentences was mandatory but rather argues the court, in imposing sentence, failed to consider "the significant mitigating factors and [his] potential for rehabilitation."

¶ 31    The Illinois Constitution states "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all aggravating and mitigating factors, including: "the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well

as the nature and circumstances of the crime and of defendant's conduct in the commission of it." *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 32    The trial court, not the reviewing court, is in the best position to assess these factors because it has observed the defendant and the proceedings. *People v. Alexander*, 239 Ill. 2d 205, 213 (2010). Accordingly, the trial court has broad discretionary powers in imposing a sentence, which are entitled to great deference. *Id.* at 212. We do not reweigh the evidence in aggravation and mitigation or substitute our judgment for that of the trial court merely because we would have weighed these factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). Instead, we will overturn a sentence only where the trial court has abused its discretion. *People v. Sauseda*, 2016 IL App (1st) 140134, ¶ 19. An abuse of discretion occurs when the court's sentence "is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 33    After reviewing the record, we conclude the trial court did not abuse its discretion when it sentenced defendant to consecutive terms of nine years' imprisonment and a concurrent term of six years' imprisonment. The PCSA offenses, as charged here, are Class X felonies, which have a statutorily mandated sentencing range of 6 to 60 years' imprisonment. 720 ILCS 5/11-1.40(a)(1), (b)(1) (West 2014). The offense of ACSA is a Class 2 felony, which has a statutorily mandated sentencing range of 3 to 7 years' imprisonment. 720 ILCS 5/11-1.60(b) (West 2014); 730 ILCS 5/5-4.5-35(a) (West 2016). Because defendant's nine-year prison sentences on each of the PCSA convictions and six-year prison sentence on the ACSA conviction fell within the applicable sentencing ranges, we presume the sentences are proper. *Charleston*, 2018 IL App (1st) 161323, ¶ 16. This presumption will be rebutted only if defendant makes an affirmative showing the sentence

greatly departs from the spirit and purpose of the law or the constitutional guidelines. *People v. Boclair*, 225 Ill. App. 3d 331, 335 (1992). Defendant has failed to make such a showing.

¶ 34    Defendant argues the trial court "was given plenty of mitigation to consider before passing sentence" but failed to adequately consider it or his potential for rehabilitation. Specifically, he argues the court failed to adequately consider his employment history, his minimal criminal history, the fact he supported his family financially and otherwise both in the United States and in Honduras, and the fact he was a great father to his children, who missed and needed him. Further, he asserts the State's pretrial plea offer of seven years' imprisonment supports his contention the sentence imposed by the court was excessive.

¶ 35    Defendant essentially invites this court to reweigh the evidence in aggravation and mitigation and substitute our judgment for that of the trial court. Indeed, defendant argues, "Had the court *adequately considered* the mitigating evidence and [his] rehabilitative potential, it would have imposed a sentence closer to the minimum." (Emphasis added.) We reject his invitation to do so. *Stacey*, 193 Ill. 2d at 209.

¶ 36    Moreover, based on this record, we are unable to conclude the trial court did not give adequate weight to the mitigating factors relied upon by defendant. There exists a presumption the court carefully considered all mitigating factors supported by the record absent some affirmative indication, other than the sentence itself, to the contrary. *People v. Jones*, 2014 IL App (1st) 120927, ¶ 55. Here, defendant's employment history, minimal criminal history, his support of his family, and his family's support of him were all before the court when it imposed sentence. Indeed, defendant concedes the court recognized he had "quite a bit of mitigation" which it did not ignore in coming to its sentencing decision. But defendant points to nothing other than the length of the

sentence imposed to argue the court did not adequately consider the mitigating evidence. Accordingly, we will not disturb defendant's sentence.

¶ 37    Further, it is well-established the seriousness of the offense is the most important sentencing factor, and the trial court is not required to give greater weight to the mitigating factors or defendant's rehabilitative potential than to the seriousness of the offense. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 123.

¶ 38    Defendant's conduct in this case was egregious and was sufficiently serious to warrant an aggregate sentence only six years more than the minimum. The evidence at trial overwhelmingly established that defendant assaulted his five-year-old niece by placing his penis in her hand and mouth and placing his hand on her vagina. In addition, N.L.'s statement to her mother and interview at the Children's Advocacy Center, admitted at trial pursuant to section 115-10 of the Code, established defendant kissed her and placed his hand on her vagina "every day" and placed his penis in her mouth and on her vagina "many times," which led to N.L. exhibiting sexual behavior in public and on her younger sister. See *People v. Ivy*, 313 Ill. App. 3d 1011, 1019 (uncharged conduct is relevant to the court's sentencing determination). Further, defendant threatened to put five-year-old N.L.'s parents in jail if she told anyone and fractured his family's relationship.

¶ 39    Admittedly, defendant's employment history, familial support, and minimal criminal history showed he had some rehabilitative potential. However, the record also shows he lacked remorse for his actions which bears negatively on his prospects for rehabilitation. In his allocution, defendant told the trial court that what the State's testified to was "not true" and that he "was not like that" despite the fact he admitted some of the charged conduct to police. See *Charleston*, 2018

IL App (1st) 161323, ¶ 29 (lack of remorse is properly considered in aggravation at sentencing and is indicative of the defendant's character and prospects for rehabilitation). Considering this record, we find defendant's sentence was appropriate.

¶ 40    Defendant also argues his consecutive nine-year sentences, which were to be served at 85%, were "significantly more than the seven years, to be served at 50[%] time, offered by the State prior to trial," and, given the significant disparity between the sentence deemed appropriate by the State prior to trial and that which was imposed after trial, his sentence was excessive.

¶ 41    We reject defendant's argument. Simply put, the State's prior plea offer holds no relevance to the trial court's determination of an appropriate sentence. *People v. Schnoor*, 2019 IL App (4th) 170571, ¶¶ 93-94. Indeed, this court has recently "emphatically reiterate[d] that what the State may have offered defendant during plea negotiations *is irrelevant*." (Emphasis in original.) *Id.* ¶ 93. Accordingly, we reject defendant's argument that the State's prior plea offer suggests his aggregate 18-year sentence was excessive.

¶ 42    In sum, we find the trial court adequately weighed the evidence in aggravation and mitigation and fashioned a sentence that was appropriate under the circumstances, particularly considering the seriousness of the offense. We therefore find defendant has failed to establish that his sentence is "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *Charleston*, 2018 IL App (1st) 161323, ¶ 16.

¶ 43    For the reasons stated, we affirm the trial court's judgment.

¶ 44    Affirmed.