NOTICE
Decision filed 05/13/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220797-U

NO. 5-22-0797

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 20-CF-575 |
| | ) | |
| JAMES B. BROWN, | ) | Honorable |
| | ) | Randall B. Rosenbaum, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justices Welch and McHaney concurred in the judgment.

**ORDER**

¶ 1    *Held*: We affirm the defendant's conviction and sentence but remand this matter for the limited purpose of allowing the trial court to conduct the necessary preliminary examination into the factual basis of the defendant's allegations against his appointed counsel.

¶ 2    On July 22, 2022, after a bench trial, the defendant, James B. Brown, was convicted of one count of aggravated domestic battery in violation of section 12-3.3(a-5) of the Criminal Code of 2012 (Code) (720 ILCS 5/12-3.3(a-5) (West 2020)). The defendant was sentenced on September 8, 2022, to 12 years' incarceration within the Illinois Department of Corrections (IDOC). The defendant filed a timely notice of appeal and now challenges his conviction and sentence. The defendant also raises the issue of whether the trial court erred in not conducting an inquiry under *People v. Krankel*, 102 Ill. 2d 181 (1984), and its progeny, regarding the defendant's *pro se*

1

posttrial allegations of ineffective assistance of counsel. For the following reasons, we affirm the defendant's conviction and sentence, but remand this matter for the limited purpose of allowing the trial court to conduct the necessary preliminary examination into the factual basis of the defendant's allegations against his appointed counsel.

¶ 3                                    I. BACKGROUND

¶ 4      On May 29, 2020, the defendant was charged by information with one count of aggravated domestic battery in violation of section 12-3.3(a-5) of the Code (*id.*). The charge alleged that the defendant had, on May 21, 2020, intentionally strangled Lauren Barnes, a family, or household member of the defendant.

¶ 5      A bench trial was conducted on July 22, 2022. At trial, the State called two witnesses. The first witness to testify was Lauren Barnes. Lauren testified that the defendant was her former boyfriend and that they had one child together: a daughter, one and a half years old at the time of the incident. Lauren stated that on the day of the incident, she was not living with the defendant, but that he regularly visited her residence since they were still in "[a] very rocky" dating relationship. Lauren testified that the defendant received his mail at her address, but that he did not have clothing items at her residence.

¶ 6      Lauren testified that on the day of the incident, she and the defendant had gotten into an argument regarding the manner in which the defendant was speaking to their daughter. The argument started in the kitchen of her home, and then moved into the living room area. Lauren stated that the defendant "was in my face, yelling, and getting physical" while she was backing away from him. Lauren admitted that she was yelling back at the defendant and telling him that she was going to call the police. Lauren stated that she had her cellular phone in her hands, and that the defendant was pushing her, had put his hands on the side of her face, and grabbed her jaw

2

and mouth area. Lauren testified that the defendant stated that he was tired of her causing him so many problems and that she was "suffocating him in the relationship, so he was going to suffocate me."

¶ 7    Lauren testified that they ended up in one of the bedrooms, where Lauren was attempting to call 911, and the defendant was attempting to get her phone away from her. Lauren stated that the defendant pushed her down and pinned her on the bed. Lauren stated that they were still fighting over the phone, and then at one point, the defendant stopped trying to get the phone and put both his hands around her neck, causing her to struggle to breathe. At that point, Lauren stated that she dropped her phone and was attempting to pry the defendant's hands off her neck telling him that she could not breathe. Lauren testified that she "was just really scared in—in that moment." Lauren estimated that she could not breathe for approximately 30 seconds. Lauren testified that the defendant then let go of her neck, grabbed her phone, and took off down the hallway. Lauren stated that she got up, ran out of the house to her neighbor's home, and called 911.

¶ 8    While outside of her neighbor's house, Lauren stated that she saw the defendant leaving in her vehicle. Lauren returned to her home where she discovered that the defendant had taken their daughter with him. Lauren testified that the police arrived and took photographs of her injuries. Lauren also stated that she had taken photographs of her injuries a few days later. The State then moved to admit the photographs taken by Laren into evidence, at which time the defendant objected on the grounds that there were no time or date data on the photographs and no information, other than Lauren's testimony, regarding when, or under what circumstances, the photographs were taken. Over the defendant's objection, the trial court admitted the photographs into evidence.

¶ 9    The State then published the photographs and Lauren testified that the photographs showed "a bruise that was on my chin from him grabbing my face," "bruises on my upper arm, on my right arm," and an injury to the inside of her right arm. Lauren stated that after the incident, she discontinued her relationship with the defendant.

¶ 10    On cross-examination, Lauren could not recall exactly what she had stated to law enforcement when they arrived after the incident. Lauren did recall having a conversation with an Officer Dedecker. Portions of Officer Dedecker's body-worn camera video was then played in open court. Lauren admitted that she had an ice pack on her neck area when speaking with Officer Dedecker and that an ice pack can cause some redness. Lauren also stated that she was very upset that the defendant had taken their daughter but could not recall saying, "If I say yes, will that make you find her faster?" when asked by Officer Dedecker whether she believed her daughter was in danger. Shortly after speaking with Officer Dedecker, Lauren stated that the defendant's mother arrived and returned her daughter. Lauren stated that she had never been to court regarding custody of their daughter.

¶ 11    The State then called Officer Collin Dedecker to testify. Officer Dedecker testified that he was a police officer who was employed by the City of Urbana and that on May 21, 2020, he was dispatched to Lauren's residence for a domestic incident report. When he arrived, Officer Dedecker stated that Lauren was outside of her neighbor's house, was crying, and was visibly upset. Officer Dedecker stated that he observed redness on Lauren's cheek and neck, so he took photographs. The State then moved to admit and publish the photographs taken by Officer Dedecker, and the defendant had no objection.

¶ 12    Officer Dedecker stated that the first photograph showed redness on Lauren's chest, just above the V-neck of her shirt. The next photograph showed "redness above the V-neck of

[Lauren's] collar or of her shirt, and then a little bit of redness on the front of her neck." The next photograph showed "redness on the side of [Lauren's] neck." Officer Dedecker stated that the redness was on the right side of Lauren's neck and the next photograph showed no redness on the left side of Lauren's neck. Officer Dedecker testified that, "I took one of her right side to show that there is redness on it, the left side to show that there's no redness on it, to show the different coloration, indicating that there possibly was an injury due to the right side of her neck."

¶ 13    Officer Dedecker stated that while he was speaking with Lauren, the defendant's mother arrived. Officer Dedecker testified that he spoke with the defendant's mother and informed her of the allegations that the defendant had taken the child, Lauren's phone, and Lauren's vehicle "so we wanted the child, the phone, and the car back, and I wanted to speak to [the defendant]." At some point, Officer Dedecker stated that the defendant's mother left and returned a short time later with Lauren's vehicle, phone, and the child. Officer Dedecker testified that the defendant's mother also gave him information where he could locate the defendant, but that the information was not accurate.

¶ 14    Officer Dedecker went on to testify that, at some point, he was able to contact the defendant by phone. Officer Dedecker informed the defendant that Officer Dedecker wanted to speak with the defendant and wanted the defendant to come into the Urbana Police Department. Officer Dedecker stated that the defendant did not come in and that Officer Dedecker had never spoken in person with the defendant.

¶ 15    On cross-examination, Officer Dedecker acknowledged that he was wearing a body-worn camera that was recording during his conversation with Lauren. A portion of the video recording from Officer's Dedecker's body-worn camera was then played in open court. Officer Dedecker

5

confirmed that Lauren had not mentioned the defendant using both of his hands to choke her and that he had, in fact, directly asked her that question.

¶ 16    The State rested, and the defendant moved for a directed verdict. The trial court noted that "there may be some contradictory statements here—that in some way, shape, or form [the defendant] put his arm or his hands on her neck." Based on the evidence in the light most favorable to the State, the trial court denied the defendant's directed verdict request. Defense counsel then called the defendant to testify on his own behalf.

¶ 17    The defendant stated that he was 26 years old and resided in Champaign County. The defendant testified that he had dated Lauren for approximately a year and a half, and that they had a daughter together. On the day of the incident, the defendant stated that he was living with Lauren, that he received his mail at Lauren's residence, and that he maintained personal items at Lauren's residence. The defendant further testified that he had permission to drive Lauren's vehicle at that time.

¶ 18    On the day of the incident, the defendant stated that he was in the kitchen when Lauren returned from a walk with their daughter. Lauren left their daughter in the kitchen with him and went to take a shower. The defendant stated that he started to feed their daughter and that their daughter was "throwing a fit." The defendant told his daughter that "we eat at the table like big girls, and we don't throw fits." The defendant then stated that Lauren stormed out of the shower "wrapped in her towel, dripping wet, stating she don't like the way that I'm talking to [our daughter]." The defendant stated that Lauren continued to make other statements, yelling as she walked towards the bedroom.

¶ 19    At that point, the defendant stated that he grabbed their daughter and yelled that he was taking her for a drive, since that was how they typically got their daughter asleep. The defendant

6

testified that he did not push Lauren; did not take her phone; did not grab the side of her face; did not place his forearm on her neck; nor, did he strangle her with both of his hands. He left with his daughter to take her for a drive and while driving, his phone and Lauren's phone began ringing. The defendant stated that Lauren's phone was in the car since they were following COVID protocols, "so she leaves her keys and phone in the car for after she takes a shower, she comes back out and she sanitizes with a wipe." The defendant stated that he was not aware that Lauren's phone was in the car when he left the residence.

¶ 20    The defendant stated that Lauren's dad was calling so he answered. The defendant stated that he also spoke with a police officer, but that he did not meet the officer in person. The defendant testified that the reason that he did not meet with the officer was because the officer "didn't make it seem like it was a priority." The defendant further stated that he had a "bad history" with Urbana police officers and that he thought the situation was handled over the phone. The defendant stated that he was not avoiding being arrested since there were no warrants for his arrest, but four or five days later, when he was in the hospital, he was arrested.

¶ 21    Returning to the incident, the defendant stated that one of the statements that Lauren had made was, "You are systematically suppressed against me, and I'll do whatever I can for you to never see [our daughter] again. Me and [our daughter] are a care package. You don't get one without the other." The defendant stated that he had left the residence to defuse the situation and once he realized, through his mother, that "it was made into a bigger issue," he returned their daughter through his mother.

¶ 22    On cross-examination, the defendant stated that he left the residence believing that he would drive around for a little bit, come back, and everything was going to be okay. The defendant stated that he returned to Lauren's residence the next day and that Lauren gave him his property.

7

The defendant testified that was the first time he knew that the relationship was over. The defendant acknowledged that he and Lauren had arguments in the past, but that this argument was different because she got the police involved. The defendant admitted there was a prior incident in which the police were involved, but that Lauren's father had called the police, not Lauren. The defendant stated, "That's why I was on 18 months' probation, for her father."

¶ 23 The defendant went on to testify that his mother did not tell him to come back to Lauren's residence but told him that Lauren was saying that I had "put my hands on her." The defendant stated that was when he realized that Lauren was saying those things to the police and that he had no idea where Lauren's injuries came from. No further evidence was presented by either party.

¶ 24 The trial court then asked whether there was any lesser charge that the defense was asking the trial court to consider. The defense asked the trial court to consider a lesser charge of misdemeanor domestic battery. The State informed the trial court that it would object to the lesser charge, but that it had nothing further on that issue. The trial court stated it would consider the lesser charge as well, and then heard closing arguments from the parties.

¶ 25 After arguments, the trial court discussed the evidence and then stated, in part, as follows:

"All right. Well, this has been a very brief, a very important trial. The State has alleged that the defendant committed aggravated domestic battery; essentially that on the date in question he strangled [Lauren]. And the statute doesn't define what strangulation is, but it tends to be where you do something around someone's neck, their windpipe, which prevents them from breathing well.

I don't think there's any case law that says it must be hands or fingers. I think you can strangle people with rope. I think people can put objects over their throat to be enough

8

for strangulation. But this really boils down to whether or not I believe [Lauren], or whether or not I believe [the defendant], because their stories are diametrically opposed.

* * *

When I look at the totality of the evidence here, judging the credibility, which is the demeanor, the interest, the bias, the testimony that's consistent or inconsistent with other testimony here, I find that [Lauren] was credible. I find that she seemed upset on the stand. When she didn't know the answer, she said she couldn't remember the answer. She may have had some minor inconsistencies about the officer in the statement she made about whether it was his arm on the neck or hands around her neck.

* * *

Again, when I listen to all the evidence here, I do believe the victim. I don't give much weight to the believability of the defendant, and therefore on the charge of aggravated domestic battery I do find that the State has found—proven him guilty beyond a reasonable doubt."

¶ 26    The trial court conducted a sentencing hearing on September 8, 2022. At sentencing, the State introduced two sets of incident reports from the correctional facility where the defendant was being detained and a victim impact statement for the trial court's consideration. The State then called Lieutenant Jenna Good to testify.

¶ 27    Lieutenant Good testified that she was a lieutenant at the Champaign County correction facility in charge of the classification of the inmates' housing, medical, and mental health needs. Lieutenant Good stated that she had been employed with the sheriff's office since 2006, and that she had an opportunity to review the disciplinary reports submitted by the State. Lieutenant Good

9

stated that, in addition to those reports, there had been other instances involving the defendant that were not necessarily documented in disciplinary reports.

¶ 28    Lieutenant Good stated that the defendant was initially housed in the Kankakee County correctional facility for over a year, but that the Kankakee facility had returned the defendant back to Champaign County because of behavioral issues. When the defendant returned from Kankakee, Lieutenant Good stated that the defendant was on a hunger strike, which the defendant had indicated was going to last "40 days and 40 nights, like Moses," so mental health met with the defendant. Lieutenant Good testified that mental health had met with the defendant several times but had not been able to ascertain that the defendant did, in fact, have a mental illness.

¶ 29    Lieutenant Good stated that when mental health met with the defendant on June 2, 2022, the defendant had indicated that he had previously been banging his head on the wall, had attempted to hang himself, and that he was going to smear feces onto the wall. Lieutenant Good stated that the defendant had also indicated that he wanted to be on a hunger strike because he could, and because he wanted the correctional officers to do paperwork. Lieutenant Good testified that she had then classified the defendant as a high risk or high security inmate.

¶ 30    Lieutenant Good also stated that on June 4, 2022, the defendant had made threats to a correctional officer that the defendant would find the correctional officer, follow him home, harm his family, and rape his kids. Lieutenant Good testified that on multiple occasions, the defendant had indicated that he would throw urine and feces on the correctional officers. On July 21, 2022, Lieutenant Good stated that the defendant had indicated that he was going to spit in her face the next time he saw her. The defendant also informed a correctional officer that the defendant wanted to get the most amount of time that the jail had ever seen for disciplinary infractions.

10

¶ 31 Lieutenant Good also testified that, on August 9, 2022, the defendant had injured a correctional officer who was attempting to check for contraband in the defendant's cell. Lieutenant Good testified that the defendant stated afterwards as follows:

"The next time there are high security checks, there will be another staff assault. I cannot wait for round two. There will be more blood this time after I beat your all a\*\*\*. In the morning, you all about to get a workout. I'm gonna start swinging at them. The next mother\*\*\* who walks into my cell is done. Next time, instead of letting them hit me with a shield, I'm gonna run out this b\*\*\* and make them work. I'm gonna kill their a\*\*\*."

¶ 32 Lieutenant Good stated that the above was pretty standard of how the defendant spoked to the correctional officers. Lieutenant Good then discussed the incident report of August 23, 2022, which documented that the defendant had threatened to burn down the home of a specific correctional officer and rape the correctional officer's daughter when the defendant got out of jail. Lieutenant Good further stated that there was an incident on the bus to Kankakee on April 20, 2022, where the defendant caused blunt force trauma to a correctional officer. In her 16 years as an employee at the correctional facility, Lieutenant Good stated that the defendant's behavior was one of the worst she had seen. On cross-examination, Lieutenant Good testified that she was not present during any of the above incidents, so she had no personal knowledge of the incidents. No further evidence in aggravation was submitted by the State.

¶ 33 In mitigation, the defense asked the trial court to consider a letter sent by the defendant to the trial court dated August 12, 2022, in which the defendant had stated that he was sorry for the crimes he had committed. No further evidence in mitigation was submitted by the defendant.

¶ 34 The trial court then heard arguments by the parties. Defense counsel noted that the presentencing report indicated that the defendant had been removed from his mother's care as a

11

young child because of abuse, and that he had multiple placements while in the care of Department of Children and Family Services (DCFS). Defense counsel stated that the defendant had been separated from his siblings, which were the defendant's only stable family. Defense counsel acknowledged that the defendant needed anger management, mental health treatment, and substance abuse treatment to teach the defendant some coping mechanisms. Defendant counsel also acknowledged that the defendant's criminal history went back to 2012, and that the current incident would be his third felony conviction but argued that "most of it happened while [the defendant] was a juvenile." Defense counsel further argued that the defendant had been failed by his parents, and then failed by the State of Illinois. Finally, defense counsel requested that the trial court consider this matter separately from the new charge pending against the defendant.

¶ 35     The trial court then gave the defendant an opportunity to make a statement. The defendant told the trial court that he was sorry and that he was ready to serve whatever sentence was given. The defendant stated that he was ready to become a better person, not just for himself, but for his daughter. The defendant further stated that during his time in IDOC, he planned on taking higher education and self-help classes to learn better coping skills to control his impulses. The defendant again apologized to Lauren and asked the trial court to impose a fair sentence.

¶ 36     Upon completion of the defendant's statement, the trial court stated as follows:

     "The Court has considered the evidence from trial, the presentence investigation, the evidence presented here, both statutory and non-statutory factors in aggravation and mitigation. I've considered the arguments of the counsel and the Defendant. I've also considered the history and character of the Defendant. I have a due regard for the seriousness of the offense, but it's always with the objective of restoring the defendant to useful citizenship.

12

I do find—I want to make the following observations. There is very little mitigation here. This was a bench trial. He did accept responsibility here today and he wrote a letter to me indicating that. And to some extent, he had a rough upbringing in DCFS care, and may have suffered trauma from that. That can't be an excuse forever. He's offered the ability to work through these issues throughout his life, and he needs to take advantage of it. Not everybody who goes through DCFS care turns out to be a criminal and act as badly as [the defendant] has. But to some small degree, I do find that to have some mitigating factor.

There is aggravation here. There is deterrence to send a message to [the defendant] that he cannot continue to commit crimes like this. This is not the first time that he has committed a battery-type offense. It's also to send a message to people in the community who might be in the same situation that he should not commit crimes like this.

I also have to consider in aggravation the prior record. Goes back to being a juvenile. He has an adult record. Misdemeanors for battery, criminal damage to property, another battery. He has a resisting. He also has a number of felonies, including robbery—two different robberies. And now this case of aggravated domestic battery, a Class 2 felony.

\* \* \*

On the one hand, I would think that maybe he has mental health issues, but he did not really identify having any kind of mental health issues other than depression and anger control, really. He denied suicidal thoughts. He's been assessed at the jail. They don't come up with a diagnosis of schizophrenic or paranoid or any diagnosis like that.

\* \* \*

13

I recognize that he's 26 years old. He has a three-year-old child. He doesn't have

his GED. He was able to work before his arrest. I recognize he had alcohol and other issues

prior to his incarcerations. He would take a lot of drugs as well, many times to ease the

pain, which I can understand.

*** 

Based on the totality of the evidence presented at trial, presented in the PSI, what

I've heard here today, [the defendant's] rehabilitative potential I find is very low despite

his comments to the Court here today. Therefore, upon the conviction after a trial of

aggravated domestic battery, a Class 2 felony, the Court hereby sentences the Defendant

to service a period of 12 years in the Illinois Department of Corrections."

¶ 37    On October 11, 2022, the defendant, through counsel, filed a motion to reconsider sentence. The defendant's motion to reconsider sentence argued that the defendant's sentence was excessive, and not in keeping with the defendant's history of criminality, family situation, economic status, age, and potential for rehabilitation. Thereafter, on October 17, 2022, the defendant filed a *pro se* motion for reduction of sentence. The defendant's *pro se* motion stated, *inter alia*, that "Defense counlse [*sic*] failed to properly defened [*sic*] me at trail [*sic*] and sentencing hearing. I was not informed of extended-term sentencing until the day of trial." On November 1, 2022, the trial court struck the defendant's *pro se* motion to reconsider sentence as untimely, and because the defendant was represented by counsel.

¶ 38    The trial court conducted a hearing the defendant's motion to reconsider sentence on November 30, 2022. At the beginning of the hearing, the trial court noted that the defendant was not present due to the failure of a writ being executed. Defense counsel stated that, "I would be— for my motion to reconsider, I would be waiving his presence." The trial court gave defense

counsel an opportunity to adopt the defendant's *pro se* motion and defense counsel declined to do so. Upon completion of the hearing, the trial court denied the defendant's motion to reconsider the defendant's sentence. Thereafter, the defendant filed a timely notice of appeal.

¶ 39                                II. ANALYSIS

¶ 40    On appeal, the defendant raises three issues for this court's consideration. First, the defendant argues that the evidence was insufficient to prove the defendant guilty of aggravated domestic battery by way of strangulation. Second, the defendant argues that the trial court abused its discretion by failing to adequately consider the defendant's troubled childhood, lifelong struggles with mental illness, and overall rehabilitative potential at sentencing. Third, that the trial court erred by failing to conduct a preliminary *Krankel*, 102 Ill. 2d 181, inquiry into the factual matters underlying the defendant's claim of ineffective assistance of trial counsel raised by the defendant in his *pro se* posttrial motion. We will address each issue in the order raised.

¶ 41                         A. Sufficency of the Evidence

¶ 42    The defendant argues that the State's evidence was insufficient to prove the defendant guilty of aggravated domestic battery by way of strangulation. According to the defendant's argument, Lauren's testimony as to strangulation was significantly impeached by defense counsel and the photographic evidence admitted did not support Lauren's testimony that she was strangled by the defendant placing his hands around her neck. The defendant also argues that Lauren's statement that "If I say yes, will that make you find her faster?" to Officer Dedecker, when he inquired whether Lauren believed her daughter was in danger, suggested that Lauren was willing to exaggerate the truth. As such, the defendant argues that this court should reduce the aggravated domestic battery conviction (720 ILCS 5/12-3.3(a-5) (West 2020)) to a conviction of domestic battery (*id.* § 12-3.2(a)(1)) and remand for sentencing on the reduced offense.

15

¶ 43 We first note that the defendant did not raise any issues related to his trial within his posttrial motion. Generally, for a criminal defendant to preserve an issue for review on appeal, the defendant must object at trial and raise the issue in a written posttrial motion. *People v. Reese*, 2017 IL 120011, ¶ 60. Failure to do so will normally result in the forfeiture of any review of the error. *People v. Jackson*, 2022 IL 127256, ¶ 15. A challenge to the sufficiency of the evidence to sustain a conviction, however, presents an exception to the forfeiture rule and is therefore reviewable notwithstanding any failure to raise the issue in a posttrial motion. *People v. Hall*, 194 Ill. App. 3d 532, 535 (1990). Accordingly, we will review defendant's contention.

¶ 44 Our standard of review for a challenge to the sufficiency of the evidence in a criminal case has been stated by our supreme court as follows:

"When considering a challenge to a criminal conviction based upon the sufficiency of the evidence, this court will not retry the defendant. [Citation.] Rather, in such cases the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] Thus, it is our duty in the case at bar to carefully examine the evidence while giving due consideration to the fact that the court and jury saw and heard the witnesses. [Citations.] If, however, after such consideration we are of the opinion that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt, we must reverse the conviction. [Citations.] The testimony of a single witness, if it is positive and the witness is credible, is sufficient to convict. [Citations.] While credibility of a witness is within the province of the trier of fact, and the finding of the jury on such matters is entitled to great weight, the jury's determination is not conclusive. Rather, we will reverse a conviction where the evidence is so unreasonable,

16

improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt. [Citations.]" *People v. Smith*, 185 Ill. 2d 532, 541-42 (1999).

¶ 45    The defendant argues that Lauren's testimony that the defendant had "put his hands around my neck" was inconsistent with her telling Officer Dedecker, immediately following the incident, that the defendant had "placed his arm across [her] neck." The defendant further argues that the photographic evidence did not support Lauren's testimony that the defendant had strangled her since the photographs depicted some light redness on the right side of Lauren's neck and no redness on the left side of her neck. According to the defendant's argument, none of the photographs admitted at trial supports Lauren's trial testimony that the defendant placed both of his hands around her neck and strangled her for 30 seconds.

¶ 46    Subsection 12-3.3(a-5) of the Code defines "strangle," for the purpose of that subsection, as "intentionally impeding the normal breathing or circulation of the blood of an individual by applying pressure on the throat or neck of that individual or by blocking the nose or mouth of that individual." 720 ILCS 5/12-3.3(a-5) (West 2022). The statute does not state a specific manner in which the pressure must be applied on the throat or neck of an individual or that a victim must have been strangled for any specific length of time; only that such pressure impeded the normal breathing or circulation of the blood of the individual. *Id.*; see also *People v. Inyang*, 2022 IL App (2d) 200087-U, ¶ 28.

¶ 47    Here, the trial court acknowledged that Lauren had "some minor inconsistencies" about whether it was the defendant's arm or hands around her neck. These inconsistencies, however, did not make it impossible for the finder of fact to reasonably accept any part of Lauren's testimony. The trial court only needed to find that the defendant impeded Lauren's breathing by applying

17

pressure on her throat or neck, and Lauren testified that she had difficulty breathing for approximately 30 seconds due to the defendant's applying pressure on her throat.

¶ 48 Contrary to the defendant's argument, the photographic evidence does demonstrate redness on Lauren's chest and neck. Officer Dedecker also testified to his observation of redness on Lauren's chest and neck. Although the absence of redness on the left side of Lauren's neck could arguably tend to indicate that the defendant had not placed both of his hands around Lauren's neck, it does not preclude a finding of strangulation as the circuit court heard evidence that the defendant impeded Lauren's breathing by placing his arm across her neck. We further find that Lauren's statement to Officer Dedecker, regarding her daughter's safety, does not impeach Lauren's credibility since it was a single statement in regard to her child, and was not a statement related to the specific conduct of the defendant during the incident in question.

¶ 49 The trial court took into consideration "the demeanor, the interest, the bias, the testimony that's consistent or inconsistent with other testimony here." Upon consideration of those factors, the trial court found Lauren to be credible. It has been long held that the trial court is in the best position to make credibility determinations and that great weight is to be given to those determinations. *People v. Deleon*, 227 Ill. 2d 322, 332 (2008); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The trial court found Lauren to be credible, and the testimony of a single witness, if it is positive and the witness is credible, is sufficient to convict. *Smith*, 185 Ill. 2d at 541.

¶ 50 After viewing the evidence in the light most favorable to the prosecution, we find that the evidence in this matter was not so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt, and further find that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Therefore, we find that the trial court did not err in finding the defendant guilty of aggravated domestic battery.

18

¶ 51                                    B. Sentence

¶ 52    The defendant next argues that the trial court abused its discretion by failing to adequately consider the defendant's troubled childhood, lifelong struggles with mental illness, and overall rehabilitative potential at sentencing. The defendant states that the presentence investigation report (PSI) described the defendant's difficult childhood and his removal from his mother's custody due to physical abuse. Concerning his mental health, the defendant points to the trial court's comment that the defendant "did not really identify having any kind of mental health issues other than depression and anger control." The defendant argues that the PSI demonstrated that the defendant was diagnosed with a learning disability in elementary school and had at least two mental health crises requiring hospitalization between the ages of six and nine. The PSI also indicated that the defendant had been diagnosed with bipolar disorder, post-traumatic stress disorder, and oppositional defiant disorder.

¶ 53    Finally, the defendant argues that he has rehabilitative potential having earned certificates in construction and forklift operation, which were stated in the PSI. As such, the defendant argues that the trial court did not properly consider all the mitigation evidence presented in the PSI but focused primarily on the defendant's criminal history and the evidence presented at the hearing regarding his behavior in jail.

¶ 54    The trial court is in the best position to fashion a sentence that strikes an appropriate balance between the goals of protecting society and rehabilitating the defendant. *People v. Risley*, 359 Ill. App. 3d 918, 920 (2005). To achieve the constitutionally mandated balance between the retributive and rehabilitative purposes of punishment, the trial court must carefully consider all aggravating and mitigating factors, including, *inter alia*, the defendant's age, demeanor, habits, mentality, credibility, criminal history, general moral character, social environment, and education, as well

19

as the nature and circumstances of the crime and the defendant's conduct in the commission of the crime. *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002). This court will not substitute our judgment for the trial court because we may have weighed the sentencing factors differently. *People v. Decatur*, 2015 IL App (1st) 130231, ¶ 12. "There is a presumption that the trial court considered all relevant factors in determining a sentence, and that presumption will not be overcome without explicit evidence from the record that the trial court did not consider mitigating factors or relied on improper aggravating factors." *People v. Boots*, 2022 IL App (2d) 200640, ¶ 43. As such, a trial court's sentencing determination will not be disturbed absence an abuse of discretion. *Id.* ¶ 42. A sentence within the statutory limits will only be an abuse of discretion if "it is at variance with the spirit and purposes of the law or manifestly disproportionate to the nature of the offense." *Decatur*, 2015 IL App (1st) 130231, ¶ 12.

¶ 55    The sentencing range for aggravated domestic battery, when extended-term eligible, is 7 to 14 years' incarceration. 720 ILCS 5/12-3.3(b) (West 2020). In this matter, the defendant was sentenced to 12 years' incarceration, which is within the statutory limits, evoking the presumption that the trial court considered all relevant factors in determining the sentence. The defendant attempts to overcome this presumption by arguing that the trial court failed to properly consider the defendant's troubled childhood, lifelong struggles with mental illness, and overall rehabilitative potential at sentencing. The record on appeal, however, disputes the defendant's argument.

¶ 56    The report of proceedings in this matter demonstrates that the trial court considered the defendant's childhood and noted that "he had a rough upbringing in DCFS care." The report of proceeding also demonstrates that the trial court considered the defendant's mental health. The trial court noted that the defendant's mental health evaluation conducted at the jail did not "really

20

identify having any kind of mental health issues other than depression and anger control, really." Although the defendant's argument stresses the numerous mental health challenges that the defendant had faced in the past, the PSI stated that the most recent mental health evaluation, conducted on September 24, 2019, resulted in a recommendation that the defendant complete anger management and individual counseling as noted by the trial court. We further note that the defendant stated at the hearing that he "needs mental health treatment," but presented no evidence that he was currently suffering from any mental health issues other than those identified in his most recent mental health evaluation.

¶ 57    With regard to the defendant's rehabilitative potential, the trial court noted the defendant's age, his education, and that the defendant "was able to work before his arrest." The trial court also noted the defendant's criminal history, character, and the seriousness of the offense "with the objective of restoring the defendant to useful citizenship." The trial court, however, found that "[b]ased on the totality of the evidence presented at trial, presented in the PSI, what I've heard here today, [the defendant's] rehabilitative potential I find is very low."

¶ 58    The defendant does not argue that the trial court failed to consider any of the required statutory factors but argues that the trial court failed to "carefully" consider the above mitigation factors. A sentencing court is not, however, required to recite and assign value to each factor in aggravation and mitigation, nor is a sentencing court required to award a defendant's rehabilitative potential greater weight than the seriousness of the offense. *People v. Bryant*, 2016 IL App (1st) 140421, ¶¶ 16-17. We presume that the trial court considered only appropriate factors in sentencing the defendant and the record in this matter does not affirmatively show otherwise. We therefore find that the trial court's sentencing determination was not an abuse of discretion.

¶ 59                    C. *Pro se* Allegation of Ineffective Assistance of Counsel

¶ 60    The final issue raised by the defendant on appeal is whether the trial court erred by failing

to conduct a preliminary *Krankel*, 102 Ill. 2d 181, inquiry into the factual matters underlying the

defendant's claim of ineffective assistance of trial counsel raised by the defendant in this *pro se*

posttrial motion. Because no *Krankel* inquiry was conducted, the defendant argues that this matter

should be remanded for a *Krankel* inquiry, and the State agrees with the defendant on this issue.

¶ 61    Our supreme court has developed, through *Krankel* and its progeny, a procedural

framework for the resolution of *pro se* posttrial claims of ineffective assistance of counsel. *People*

*v. Murray*, 2017 IL App (3d) 150586, ¶ 21. The procedural framework requires the trial court to

make a preliminary inquiry into a *pro se* claim of ineffective assistance of counsel and, if the claim

shows a possible neglect of the case, appoint new counsel to pursue the claim at a full hearing. *Id.*

It has consistently been held that the goal of any *Krankel* proceeding is to facilitate the trial court's

full consideration of a defendant's *pro se* claim, thereby potentially limiting issues on appeal, and

creating the necessary record for any claims raised on appeal. *People v. Ayres*, 2017 IL 120071,

¶ 13.

¶ 62    To initiate a preliminary *Krankel* inquiry, a defendant simply needs to bring the claim to

the trial court's attention. *Id.* ¶ 11. The defendant does not have to file a written motion but can

simply send a note or letter to the trial court or raise the issue orally. *Id.*; *People v. Bates*, 2019 IL

124143, ¶ 15. The trial court should examine the facts and circumstances surrounding the allegedly

ineffective representation with the purpose of determining what further action, if any, is warranted

on a defendant's claim. *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). The trial court may deny

the *pro se* posttrial allegations of ineffective representation, without the appointment of new

counsel and without holding further proceedings, if the court determines that the claim lacks merit

or pertains only to matters of trial strategy. *Id.* at 78. If the defendant's allegations show possible neglect of the case, however, new counsel should be appointed to represent the defendant at a hearing on the defendant's ineffective assistance of counsel claims. *Id.* Where it is not clear what concern a defendant is attempting to raise, the trial court should conduct a "minimal inquiry" to determine the nature of the defendant's complaint. *Ayres*, 2017 IL 120071, ¶ 15.

¶ 63    Our standard of review of an alleged *Krankel* error depends upon what action, if any, the trial court undertook. If the trial court took no action, or expressed no opinion on the merits, then our review is *de novo*. *People v. McLaurin*, 2012 IL App (1st) 102943, ¶ 41. *De novo* review means that this court performs the same analysis that a trial judge would perform. *Id.* If the trial court reached a determination on the merits of the defendant's ineffective assistance of counsel claim, this court will only reverse if the trial court's action was manifestly erroneous. *Id.* In this matter, the trial court took no action regarding the defendant's posttrial allegations and as such, our review is *de novo*.

¶ 64    Here, both the defendant and the State agree that the trial court should have conducted at least some minimal inquiry to determine the basis of the defendant's *pro se* claim that his trial counsel had failed to properly defend the defendant at trial and at sentencing, thus ensuring that an adequate record was made of the defendant's claim. We agree, and accordingly, we conclude that the trial court erred in failing to conduct the necessary preliminary examination as to the factual basis of the defendant's allegations against his appointed trial counsel. We therefore remand this matter for the limited purpose of allowing the trial court to conduct the necessary preliminary examination as to the factual basis of the defendant's ineffective assistance of counsel allegation.

¶ 65    If the trial court determines that the defendant's claim of ineffective assistance of counsel is spurious or pertains only to trial strategy, the trial court may then deny the claim and leave

23

standing the defendant's conviction and sentence. *Moore*, 207 Ill. 2d at 81. If the trial court finds that the defendant did not, in fact, receive effective assistance of counsel, then it shall order a new trial. *Krankel*, 102 Ill. 2d at 189.

¶ 66                                     III. CONCLUSION

¶ 67    For the foregoing reasons, we affirm the defendant's conviction and sentence, but remand this matter to the trial court of Champaign County for the limited purpose of allowing the trial court to conduct the necessary preliminary examination into the factual basis of the defendant's allegation of ineffective assistance of trial counsel.

¶ 68    Affirmed and remanded.